[No. S056891. May 24, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES ALVIN THOMPSON, Defendant and Appellant.

84

COUNSEL

Irene Kiebert, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WERDEGAR, J.**—On April 24, 1996, a Riverside County jury found defendant James Alvin Thompson guilty of first degree murder and found true the special circumstance allegation that the murder was committed while defendant was engaged in the commission or attempted commission of robbery, in violation of Penal Code section 211. (Pen. Code, §§ 187, 189, 190.2, subd. (a)(17)(A).)[1] The jury found not true the allegation that defendant personally used a firearm. (§ 12022.5.) In a subsequent proceeding, the jury also found true the special circumstance allegation that defendant had been convicted of a prior murder in Texas in 1977. (§ 190.2, subd. (a)(2).) After the penalty phase, the jury returned a verdict of death. The trial court denied defendant's motions for a new trial (§ 1181) and for modification of the penalty (§ 190.4, subd. (e)) and sentenced him to death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

We affirm the judgment.

INTRODUCTION

On the evening of either August 26 or August 27, 1991, defendant, a 39-year-old White male, met the victim, Ronald Gitmed, a 25-year-old White

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

male with mental developmental disabilities. Defendant convinced Gitmed to drive him to a trailer compound in rural Riverside County to visit Tony Mercurio, whom defendant had met when they were both serving time in prison. Later that same night, defendant, Gitmed, and Mercurio left the trailer compound in Mercurio's truck to go four-wheel driving in the hills around Canyon Lake. On the morning of August 28, Gitmed's body was found floating in a remote section of the lake; he had been killed by three gunshot wounds. The prosecution's main witness was Mercurio, who testified defendant robbed and shot Gitmed at Canyon Lake. Other individuals living at the trailer compound testified that, after the murder, defendant took Gitmed's car and, together with Mercurio, removed Gitmed's property from Gitmed's storage locker in Riverside. The defense challenged Mercurio's credibility and presented an alibi defense that defendant had been with his uncle the entire evening of August 27.

## I. GUILT PHASE

### A. *Facts*

#### 1. *The Prosecution's Case*

##### a. *Discovery of the body and autopsy*

In the late morning of August 28, 1991, a group of people who had gone to Canyon Lake in Riverside County to jet ski discovered the body of Ronald Gitmed floating in the water. The body was clad in a pair of Levis and white socks, but no shirt. An autopsy the next morning found three gunshot wounds to the body, one on the right upper chest, one on the left side of the lower back, and one on the left forearm. Two expended .22-caliber bullets were removed from the body, but whether they had been fired from the same gun could not be determined. The coroner found the remains of hamburger, potato, and pickle in Gitmed's stomach. A blood analysis detected methamphetamine but no alcohol. In the coroner's opinion, Gitmed had died immediately from the gunshot wounds, and the absence of water in his airway passages indicated he had not drowned. The coroner could not pinpoint a time of death beyond saying that Gitmed had not been dead for very many days.

##### b. *Timeframe for the murder*

The prosecution presented evidence that Gitmed was alive at least up to the early evening of Monday, August 26, 1991, but was dead by the morning of Wednesday, August 28, when his body was discovered floating in Canyon

Lake.[2] Don Fortney, Gitmed's friend, testified that on August 26, Gitmed was vacating his apartment, and Fortney helped him move his possessions to a storage locker, finishing about 3:00 p.m.[3] Gitmed also stored stacks of his clothing in his car, a small blue Toyota Tercel hatchback. Gitmed's mother, Naomi Dekens, testified Gitmed visited her at her home that evening about 7:00 p.m. Bank records indicated Gitmed's last automatic teller transaction and last credit card transaction occurred on August 26.

### c. *Defendant's interactions with the victim's cousin*

Defendant met Gitmed through Gitmed's cousin, Michelle Keathley. Keathley had first met defendant at a pool hall in Riverside in August 1991. Defendant would occasionally drop by Keathley's house over the next few weeks. During one of these visits, he used methamphetamine with Keathley, Keathley's sister Alicia Levenson, and Alicia's boyfriend Eric Arias. During that visit, defendant offered Arias up to $2,000 to give him a ride to the Lake Elsinore area in order to collect a $6,000 debt owed him. Defendant mentioned he would be bringing a gun. Arias initially accepted defendant's offer, but later backed out.

At a subsequent visit to Keathley's house, sometime after 5:00 p.m. on either August 26 or 27, defendant met Gitmed.[4] Keathley's friend Ronada Briggs was at the house at the time and remembered meeting defendant and seeing him with Gitmed. For defendant's promise of $1,000, Gitmed agreed to drive him to collect the $6,000 debt. Before they left, defendant said they would first be stopping at "Tony's house." Gitmed drove off with defendant, and Keathley never saw Gitmed again.

### d. *Visit to the Triplett family trailer compound*

After leaving Keathley's house, defendant and Gitmed drove in Gitmed's car to the Triplett family trailer compound. The compound was located on Santa Rosa Mine Road in a rural area outside the town of Perris and consisted of mobilehomes, campers, and storage sheds spread over five acres. There was a "chop shop" on the property, where stolen vehicles were

---

[2] The prosecution's theory was that the murder probably occurred on the night of Tuesday, August 27, but may have occurred the night before. As recounted below, the defense presented an alibi theory based on evidence that defendant was in the company of his uncle on the evening of August 27.

[3] As recounted below, after Gitmed's murder, defendant and Tony Mercurio removed various items of furniture from this storage locker.

[4] In her interview with the police on September 11, 1991, Keathley indicated either day was possible, but leaned toward Tuesday, August 27. In her trial testimony, she said she was "pretty sure it was Tuesday."

stripped, repainted, or otherwise altered for sale. Barbara Triplett lived there with her daughter Charlene and her brother Danny Dalton, who ran the "chop shop." Also living on the property was Charlene's boyfriend, Anthony Thomas Mercurio, a parolee who had recently been released from prison. Defendant first met Mercurio in July 1991, when both of them were incarcerated in state prison, and he had visited Mercurio at the Triplett compound once before.

Mercurio had not been expecting defendant to come that night, and he did not know Gitmed, whom defendant introduced as his friend "Ron." After a dinner of hamburgers and french fries, defendant, Gitmed, and Mercurio used some methamphetamine that Gitmed had brought. While the three of them were walking around the property, Gitmed noticed a red four-wheel-drive pickup truck, and they decided to go "four-bying" in the countryside. The truck, which had been on the property for at least a couple of weeks, was stolen and had to be started with a screwdriver.

### e. The shooting at Canyon Lake

With Mercurio at the wheel, the three drove across the hills to Canyon Lake. It was after dark when they started. When they arrived at the lake, they parked on a peninsula about 30 to 40 feet from the water's edge. Mercurio stayed near the truck while defendant and Gitmed walked out onto the peninsula. Mercurio heard defendant and Gitmed start to argue, but could not make out what the argument was about. Defendant's voice got louder and angrier, and Mercurio heard defendant tell Gitmed to take off his clothes. Gitmed started to get undressed, and Mercurio heard two to three shots. Mercurio got back inside the truck. Defendant returned and threw some things into the back of the truck, including Gitmed's clothing and some small items that might have been Gitmed's wallet or some change. As they drove off, Mercurio saw Gitmed's body on the ground near, but not in, the water. They rode in silence back to the Triplett compound. At the compound, defendant started going through the items in Gitmed's car, which had been left parked there. The car was filled with several trash bags full of clothing and some stereo equipment.

### f. Defendant's activities in the days following the murder

Defendant left the compound in Gitmed's car. Michelle Keathley testified that around 3:30 on the morning following the night defendant and Gitmed had left her house, defendant came to her house to retrieve his bicycle, which he had tied to a tree near the front door. Keathley asked defendant where Gitmed was, and defendant initially said he was down the street and would arrive in a couple of minutes. When Gitmed failed to appear, Keathley again

asked: "What happened to Ron?" Defendant then stated there "was a little bit of a scuffle," and Gitmed had gotten "a little scared" and might have gone home.

At the compound a day or two after Gitmed's murder, Mercurio again saw defendant going through the items in Gitmed's car. He saw a small handgun on the car's hood. Several days later, Mercurio, at defendant's request, accompanied defendant to Gitmed's storage locker in Riverside to pick up some furniture defendant said he owned and wanted to give to Mercurio. Defendant drove Gitmed's car, and Mercurio followed in the red pickup truck. Defendant entered the correct code in the box at the storage facility's security gate, and it opened. The two went to the storage locker and loaded several small furniture items into the truck, including a television, a videocassette recorder, and a television stand. They took the items to Charlene Triplett's dwelling at the compound.

After defendant and Mercurio returned with the furniture, Charlene saw them at the dumpster burning papers. Defendant was cleaning a gun, and Mercurio asked Charlene for some lighter fluid, which he gave to defendant to clean the gun. Later, outside defendant's presence, Charlene confronted Mercurio about why they were burning papers, and he told her defendant had shot Gitmed at Canyon Lake. Later, when Charlene was in the bedroom of her mobilehome, she overheard defendant and Mercurio talking outside. Defendant told Mercurio: "Whatever you do, you've got to get your girlfriend and her family to go along with our story."

Defendant asked Charlene whether she wanted to buy the car stereo from Gitmed's car or knew anyone who did. Eventually, Dalton sold the stereo and split the money with defendant and Mercurio. Charlene deduced that the furniture was Gitmed's and asked Dalton to get rid of it. Dalton did not do so and instead stored it in his camper. On learning that, Charlene asked for the television back.

A few days after taking the furniture from the storage locker, defendant was back at the compound trying to figure out how to dispose of Gitmed's car. Defendant tried to give the car to Dalton to strip at his "chop shop," but Mercurio advised Dalton not to have anything to do with defendant or the car. Finally, defendant, along with Mercurio and Dalton driving in a separate vehicle, drove Gitmed's car to some hills near the compound, where defendant set fire to it.

Sometime during this period defendant said something to Barbara Triplett about a person floating in Canyon Lake who was not able to make decisions for himself, which made her "feel very uncomfortable and uneasy." Defendant also started boasting to Dalton about leaving someone floating in the lake,

but Dalton told him to shut up because he did not want to know anything about it. When Dalton learned that defendant had told Barbara and Charlene about the floating man, Dalton became angry and told defendant to leave the compound. Barbara gave defendant a ride to the Corona Motel in Riverside, which was the last anyone at the compound saw of him.

### g. *Police investigation following discovery of the body*

After Gitmed's body was discovered on August 28, 1991, Michelle Keathley's ex-husband told her of newspaper articles about an unidentified body found in Canyon Lake. Because two weeks had passed since she had last seen Gitmed, she became concerned and contacted the police on September 11. The police showed her pictures of the victim, whom she identified as Gitmed. She told police Gitmed had left her house with defendant. On September 13, two police officers located defendant at the home of his mother, Jean Thompson Churder, and conducted a tape-recorded interview of him. Thereafter, defendant was taken into custody on a parole violation. The recorded interview was played to the jury. In it, defendant acknowledged he knew Michelle Keathley and had briefly met Gitmed at her house, but denied ever leaving Michelle's house with Gitmed. He also denied having been at Canyon Lake any time recently.

On September 17, the police searched the Triplett compound pursuant to a narcotics warrant unrelated to the Gitmed murder. In the course of the search, the police came across an address book belonging to Barbara Triplett, which had the name "Tex" (defendant's nickname) with a telephone number. The police asked Mercurio whether he knew anyone named Tex, and Mercurio eventually acknowledged that he did, stating, "I knew you'd want to talk about Tex before you left here today." Mercurio decided to cooperate with the police and, later that day, gave a tape-recorded statement that defendant had shot Gitmed at Canyon Lake. He told them the location of Gitmed's burned car and eventually took the police to the place where Gitmed had been shot. The police asked about the stolen furniture, and Mercurio directed them to a television, a videocassette recorder, three end tables, a vacuum cleaner, a lamp, and a fan. Mercurio stated defendant had given him the furniture, and he thought it belonged to Gitmed.

Eva Lynn Thompson, defendant's sister, testified that sometime before defendant's arrest he brought to her apartment a suitcase and some boxes of clothes and asked her to store them because he was not sure he had a place to stay. After she learned of defendant's arrest, she panicked and had her son, Marc Brendlin, take the items to Churder's house. Brendlin testified that the items included boxes, a bag, some clothing, and a wallet containing business cards, but no identification.

On September 25, the police returned to Churder's home with a search warrant to look for evidence related to the murder. While they were searching the residence, Churder arrived home in her car. Police opened the trunk of her car and recovered a green London Fog jacket and a black, blue, and white nylon duffel bag, both of which Gitmed's mother identified at trial as belonging to her son. Gitmed had been wearing the jacket on Monday, August 26, when he visited his mother. The friend who had helped Gitmed move out of his apartment on August 26 also identified the nylon duffel bag as Gitmed's. A tattered wallet with business cards but no identification was found in Churder's house in a nightstand drawer in the bedroom defendant occupied before his arrest.

### h. *Mercurio's plea agreement*

In January 1992, Mercurio engaged the police in an hour-long high-speed auto chase after he ran a red light. He was arrested for felony assault on a police officer and possession of a rifle. Mercurio signed an agreement with the Riverside County District Attorney providing that in exchange for his cooperation in defendant's case the district attorney would drop some of the charges arising from the chase. As part of the agreement, Mercurio pleaded guilty to evading arrest and being a felon in possession of a firearm. He also pleaded guilty to being an accessory after the fact to Gitmed's murder, based on his having helped defendant dispose of Gitmed's car. Mercurio spent one year in custody. Under the agreement, Mercurio was obligated to testify truthfully at defendant's trial. At the time Mercurio testified, he was scheduled to be sentenced in Las Vegas later that month on a separate charge, unrelated to the California cases, of being a felon in possession of a firearm.

### 2. *The Defense Case*

The defense presented an alibi for the evening of August 27, 1991, through the testimony of defendant's uncle, who stated he had been with defendant that entire evening. In addition, to dispute Mercurio's account of the events at Canyon Lake the defense put on Marvin Avery, who testified he was at the lake around the time of the murder and saw someone who looked like Gitmed swimming and having a good time. The defense also sought to impeach Mercurio through his grand jury testimony about the murder and his high-speed chase with police officers.

### a. *Defendant's dinner with his uncle*

Defendant's uncle, Richard Brent Hartenbach, testified he took defendant out to dinner on the evening of August 27. They went to a restaurant and a bar, and he brought defendant home about 10:30 or 11:00 p.m. After

defendant's arrest, Churder called Hartenbach to tell him defendant had been arrested on suspicion of a murder she said occurred on Tuesday, August 27. Hartenbach told her that was impossible because he recalled being with defendant that night, and he knew it was Tuesday because defendant had a Wednesday morning meeting scheduled with his parole officer.

### b. *The swimming man at Canyon Lake*

At the time of the murder, Marvin Avery, who did not know anyone involved in the case, lived in Perris and was a frequent visitor to nearby Canyon Lake. After seeing a newspaper article about the discovery of Gitmed's body, Avery contacted the police. In late August 1991, about four days before he saw the newspaper article, he had been fishing at Canyon Lake. Around 10:00 p.m., he saw four men and a woman in the area. They arrived in an early 1990's model three-quarter-ton pickup truck with a black tool box and rack utility boxes. One man from the group, wearing "whitish" jeans and no shirt, was singing and having fun. He walked through Avery's campsite, within five feet of Avery, and then dived into the water. The man was a good swimmer and swam quite a distance out into the lake. Avery testified he had identified the swimming man as Gitmed from photographs shown to him by the police.

Officer Betty Fitzpatrick testified that Avery had contacted the police on August 30, 1991, after police had released a composite drawing of Gitmed, who at that point was still unidentified. The police showed Avery two autopsy photos of Gitmed, and Avery identified them as the person he had seen at Canyon Lake on August 27. On cross-examination, Fitzpatrick testified that Avery took officers to the spot where he had seen the man swimming, a location west and slightly south of the channel across from where Gitmed's body was found. Mercurio later directed police to the exact location where Gitmed's body was found.

### c. *Gitmed's storage locker*

The defense presented testimony of the manager of the ministorage facility where Gitmed used a locker. Entry to and exit from the facility required punching in an individual code at the gate, which was recorded on tape. Records from the facility showed that on August 26, there were three

entries/exits, at 2:12/2:24 p.m., 3:46/4:01 p.m., and 5:45/6:01 p.m., respectively.[5] There were no entries on August 27. On August 28, there were two entries/exits, at 12:45 p.m./1:02 p.m. and 4:24/4:41 p.m., respectively.[6]

### d. *Mercurio's grand jury testimony*

The defense read Mercurio's grand jury testimony about the shooting, which differed in some details from his testimony at trial. Unlike in his testimony at trial, in his grand jury testimony Mercurio recalled seeing defendant hold a gun on Gitmed, saw the wallet and personal items being placed on the hood of the truck, and saw Gitmed fall down at the edge of the water.

### e. *Mercurio's high-speed chase*

At trial Mercurio testified that in the high-speed chase culminating in his arrest he had never tried to ram the pursuing officers with his car. To impeach this testimony, the defense called two of the police officers involved in the chase. About 3:00 a.m., after running a stop sign, Mercurio led the officers in a vehicle pursuit that lasted nearly an hour, spanned about 20 miles, and eventually involved three or four police cars. He drove his car head on at police cars, and the police had to take evasive action to avoid being hit. Eventually, he fled on foot, and a scuffle ensued before he was apprehended.

### 3. *Prosecution Rebuttal*

Gitmed's mother, Naomi Dekens, and his younger brother, Bruce, testified that Gitmed was generally anxious and appeared slow and almost mentally retarded to people who did not know him. He had been under the care of a doctor from grade school through adulthood. He was very fearful of the water and would not go into it when they went to the beach. His mother forced him to take swimming lessons as a child, but he did not continue swimming after the lessons ended. He was self-conscious about his body and always wore big, bulky clothing. She had never seen him take off his shirt.

Thomas Crompton, the defense investigator who interviewed defendant's uncle, Richard Hartenbach, testified that Hartenbach told him that August 27, 1991, was the night he was with defendant. However, Crompton did not put that date in his report, but rather referred to the night as the date of the

---

[5] These entry/exit records for August 26 are consistent with Don Fortney's testimony that he helped Gitmed move his possessions from his apartment to the storage locker that afternoon.

[6] Gitmed's body was discovered on the morning of August 28. These entry/exit records for the afternoon of August 28 are consistent with Mercurio's testimony that Mercurio helped defendant move items from Gitmed's storage locker after Gitmed was killed.

murder, which he believed was August 27. Nor did he include in his report that the reason Hartenbach had to have defendant home by 11:00 p.m. was that defendant had a meeting with his parole officer the next morning.

The parties stipulated that Mercurio had not received immunity from prosecution for any events concerning Gitmed's death.

## B. Pretrial Issues

### 1. Exclusions of Prospective Jurors for Cause Based on Their Questionnaires

The trial court had the prospective jurors fill out a 25-page questionnaire, composed of 71 questions. On the basis of the questionnaire alone and without any oral voir dire, the trial court excused 18 potential jurors for cause. Defendant contends the substitution of written questionnaires for oral voir dire was impermissible under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[7] Alternatively, defendant contends (1) even if the exclusion of prospective jurors on the basis of written questionnaires alone was not per se unconstitutional, the questions used were confusing to the jurors or were biased, and (2) even assuming the questions were not deficient, the trial court's findings of substantial impairment for each excluded prospective juror were unreasonable and unsupported by the record. Furthermore, defendant alleges the exclusion of the identified jurors violated his rights to equal protection because the trial court's reliance on the questionnaires caused it to be more inclined to excuse life-leaning prospective jurors than those favoring the death penalty.

As discussed below, we reject all of defendant's contentions of error.

### a. Background

The questionnaire was originally proposed by defense counsel and had primarily been shaped by the review and revision of the two previous judges

---

[7] Regarding this claim and others raised on appeal, defendant contends the asserted error or misconduct violated several constitutional rights. In many instances in which defendant raised issues at trial, he failed explicitly to make some or all of the constitutional arguments he now asserts on appeal. Unless otherwise indicated, his appellate claims either required no action by defendant to preserve them, or involve application of the same facts or legal standards defendant asked the trial court to apply, accompanied by a new argument that the trial error or misconduct had the additional legal consequence of violating the federal Constitution. To that extent, defendant has not forfeited his new constitutional claims on appeal. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 408, fn. 7 [64 Cal.Rptr.3d 721, 165 P.3d 512].) On the merits, no separate constitutional discussion is required, or provided, where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or "gloss" raised for the first time here. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

assigned to the case. The judge who eventually tried the case oversaw some additional minor revisions to the questionnaire before using it in jury selection. Before the prospective jurors filled out the questionnaires, the trial court addressed the jurors with a lengthy introduction to the case and to the questionnaire, explaining the function of the guilt and penalty phases, the special circumstances, and evidence in aggravation and mitigation.

The questionnaire asked detailed questions about the prospective jurors' background, prior experiences with law enforcement and the court, and ability to follow the general presumptions of the law. It also contained specific questions about "Attitudes Towards Capital Punishment."

> b. *Analysis*
>
>> (1) *Asserted Unconstitutionality of Exclusions Based Solely on the Questionnaires*

■ Under *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], " '[a] prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is . . . subject to challenge for cause . . . .' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 671 [47 Cal.Rptr.3d 326, 140 P.3d 657].) Defendant contends the trial court violated *Witt* by excusing 18 prospective jurors for cause based solely on their written questionnaires and without any followup questioning. He argues the trial court had a constitutional duty to personally question prospective jurors. As an initial matter, respondent contends defendant has waived this claim because defendant's trial counsel himself urged the trial court to excuse jurors solely on the basis of their written questionnaires. We agree. The record indicates that trial counsel explicitly endorsed the procedure defendant now challenges on appeal. Defendant has therefore waived this claim. (Cf. *People v. Stewart* (2004) 33 Cal.4th 425, 452 [15 Cal.Rptr.3d 656, 93 P.3d 271] [claim not waived because the record disclosed no indication defendant conceded the propriety of the procedure].)

■ In the alternative, defendant contends that even if his trial counsel urged the procedure, the issue should be reviewed because counsel's performance was deficient under *Strickland v. Washington* (1984) 466 U.S 668 [80 L.Ed.2d 674, 104 S.Ct. 2052]. Defendant contends the only reason for excusing prospective jurors solely on the basis of their questionnaires was to speed up the voir dire process (which he argues is not a valid tactical reason), and trial counsel had no other valid tactical reason for urging the procedure. We disagree. On excusing prospective jurors solely on the basis of questionnaires, we have cautioned that "[t]he legitimate pursuit of laudatory efficiency

should not be transformed into an arbitrary pursuit of speed for its own sake." (*People v. Avila* (2006) 38 Cal.4th 491, 530, fn. 25 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) But such was not the case here. As expressed by trial counsel and the trial court, the reason for using the questionnaires to exclude obviously *Witt*-impaired prospective jurors was not to gain speed for its own sake; rather, it was to spend more time with the remaining jurors at voir dire. For example, Defense Counsel Jay Grossman asserted that "I think having 20 jurors on Monday morning is better than having 30 when you know there's ten or eight that you're not going to have anyway based on this question-naire," and that "my idea in suggesting that we do this, is that it gives us more time to focus on people that both sides kind of agree are a reasonable part of the pool." The record thus indicates trial counsel had a reasonable tactical strategy in urging the procedure and placing heavy initial reliance on the questionnaires.[8]

Turning to the merits of the claim, we have, as defendant acknowledges, previously rejected the argument that excusing a prospective juror for cause solely on the basis of a written questionnaire is per se unconstitutional. (*People v. Wilson* (2008) 44 Cal.4th 758, 781–790 [80 Cal.Rptr.3d 211, 187 P.3d 1041].) "[R]eliance on written responses alone to excuse prospective jurors for cause is permissible if, from those responses, it is clear (and 'leave[s] no doubt') that a prospective juror's views about the death penalty would satisfy the *Witt* standard (*Wainwright v. Witt, supra,* 469 U.S. 412) and that the juror is not willing or able to set aside his or her personal views and follow the law." (*Id.* at p. 787.) As discussed below, we conclude from our review of the individual questionnaires that the trial court did not err in discharging these prospective jurors for cause.

### (2) *Asserted Deficiencies in the Form of the Questions*

As a further general objection to the exclusions based on the question-naires, defendant contends that the form of the questions was confusing or biased and thus answers to those questions could not provide an adequate basis for the trial court's rulings. Because defense counsel initially drafted the questions, agreed to the various revisions the trial court and prosecutor suggested, and accepted, without apparent objection, the final form of the questionnaire, defendant waived these claims. Were we nevertheless to address the merits, we would find the claims meritless.

---

[8] Furthermore, because we conclude below that the trial court did not err in any of the individual exclusions, even were we to assume counsel's performance was deficient, defendant fails to show prejudice flowing from that performance.

Defendant first asserts the questionnaire used specialized legal terms such as "mitigation and aggravation," "penalty phase," and "special circumstances." He contends that to conclude the prospective jurors, without any guidance or explanation, would have grasped the full significance of these concepts when they wrote their responses is unreasonable. But defendant's premise is faulty because the trial court explained the terms and procedures to the prospective jurors before submitting the questionnaires to them. As noted above, the trial court presented a lengthy introduction to the case and to the questionnaire in which it explained the guilt and penalty phases, special circumstances, and evidence in aggravation and mitigation. The prospective jurors were thus given sufficient explanation of the legal terms to respond intelligently to the questions.

Defendant also challenges the wording of question No. 60, which stated that no circumstance exists in which a jury must automatically return a judgment of death, and that, irrespective of what the evidence might show, the jury always retains the option in the penalty phase of choosing life imprisonment without the possibility of parole. Question No. 60 then went on to ask, given that two options would be available, "can you see yourself" (A) voting for the death penalty or (B) voting for life imprisonment. Defendant contends a prospective juror might answer "no" to (A) simply because he or she could not "imagine" the situation, rather than because he or she would be unable to consider the option of imposing the death penalty. Defendant's reading of this question is unreasonable and thus unpersuasive. Within the context of the questionnaire as a whole and the court's explanations to the prospective jurors, the jurors would reasonably have understood the question as referring to their willingness to consider the option of imposing the death penalty. (See *People v. Rogers* (2006) 39 Cal.4th 826, 873 [48 Cal.Rptr.3d 1, 141 P.3d 135] [reviewing court inquires whether the jury was " 'reasonably likely' " to have construed ambiguous jury instructions in a manner that violates the defendant's rights].)

Finally, defendant contends question No. 58 was used to eliminate death penalty opponents when they answered they would "never" impose the death penalty, but not to eliminate death penalty proponents when they answered they would "always" impose it. This argument merely recasts defendant's equal protection claim, discussed below, that the trial court was more willing to dismiss life-leaning than death-leaning prospective jurors on the basis of their questionnaires alone. In sum, even assuming defendant had preserved the claim for appeal, his challenges to the questionnaire's adequacy are meritless.

### (3) *Exclusion of Prospective Jurors for Cause Based on the Questionnaires*

Defendant contends that, even assuming it was constitutional for the trial court to excuse prospective jurors for cause based on the information in their written questionnaires alone, and even assuming the questions were not deficient in form, the trial court erred in dismissing 13 prospective jurors for cause.[9] As a threshold matter, respondent contends that defendant has waived any challenges to these exclusions because trial counsel stipulated to them. We previously have precluded challenging on appeal exclusions of prospective jurors for cause when defense counsel stipulated to the exclusion. (*People v. Benavides* (2005) 35 Cal.4th 69, 88 [24 Cal.Rptr.3d 507, 105 P.3d 1099]; *People v. Ervin* (2000) 22 Cal.4th 48, 73 [91 Cal.Rptr.2d 623, 990 P.2d 506].) As defendant acknowledges, defense counsel stipulated or otherwise expressly agreed to the exclusion of five of the excused prospective jurors he now challenges, namely, R.H., A.A., J.J., L.K., and N.E. Defendant's claims are therefore barred as to them.[10] For the eight remaining excused prospective jurors, however, trial counsel merely stated that he "submitted" the exclusion to the discretion of the court, or that he would not object. Thus, while trial counsel did not stipulate to the exclusions, neither did counsel object to them. In such a circumstance, "failure to object does not forfeit the right to raise the issue on appeal, although it does suggest counsel concurred

---

[9] The trial court excused a total of 18 potential jurors for cause on the basis of their questionnaires alone. As defendant acknowledges, five of these were excused for being unable to consider the option of life in prison without the possibility of parole. Defendant challenges the exclusion of these five "pro-death-penalty" prospective jurors on the general ground that exclusion on the basis of a written questionnaire alone is unconstitutional. But he does not argue that their questionnaires failed to provide a basis for exclusion, as he does for the 13 excused "pro-life" prospective jurors. Such an argument would be unavailing in any case, because defendant can show no prejudice from the exclusion of "pro-death" prospective jurors.

[10] Were we to reach the merits of the excusals of these five prospective jurors, we would affirm the trial court's decision to excuse them. We have examined the views expressed by these prospective jurors in their questionnaires and, applying de novo review of the trial court's ruling, conclude each was properly excused. For example, R.H. had a son being prosecuted for kidnapping and robbery in the same courthouse in which defendant was being tried. A.A. reported on her questionnaire that she would be likely to find defendant guilty of murder merely because he had been charged with that crime, that she could not set aside her bias, and that she could not follow the instruction that an accused is presumed innocent. J.J. evinced a strong philosophical opposition to the death penalty and responded that he would refuse to vote to find defendant guilty despite the evidence in order to avoid imposing the death penalty. L.K. likewise had a strong opposition to the death penalty. Her opposition stemmed from her religious convictions. She responded she could not vote for the death penalty and could not set aside her anti-death-penalty bias. N.E. similarly had a strong religious opposition to the death penalty and responded that she would refuse to vote to find defendant guilty in order to avoid imposing the death penalty.

in the assessment that the juror was excusable." (*People v. Cleveland* (2004) 32 Cal.4th 704, 734–735 [11 Cal.Rptr.3d 236, 86 P.3d 302].)

■ " '[A]ssessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court.' " (*People v. Ledesma, supra,* 39 Cal.4th at p. 668.) Generally, a trial court's rulings on motions to exclude for cause are afforded deference on appeal because, in addition to the answers given, the trial court considers the tone and demeanor of the prospective jurors. (*People v. Avila, supra,* 38 Cal.4th at p. 529.) "But such deference is unwarranted when, as here, the trial court's ruling is based solely on the 'cold record' of the prospective jurors' answers on a written questionnaire . . ." (*ibid.*), which is available on appeal. Accordingly, we review the record de novo. (*Ibid.*) As we conclude below, the trial court did not err in excusing any of the challenged jurors.

(a) *Prospective Juror R.R. excused for reasons other than his attitude toward the death penalty*

Under California law, a juror may be challenged for cause for one of the following reasons: "(A) General disqualification—that the juror is disqualified from serving in the action on trial. [¶] (B) Implied bias—as, when the existence of the facts as ascertained, in judgment of law disqualifies the juror. [Or] [¶] (C) Actual bias—the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (Code Civ. Proc., § 225, subd. (b)(1)(A)–(C).) Code of Civil Procedure section 228 sets forth the grounds for a challenge based on general disqualifications and includes "(b) [t]he existence of any incapacity which satisfies the court that the challenged person is incapable of performing the duties of a juror in the particular action without prejudice to the substantial rights of the challenging party." Code of Civil Procedure section 229 sets forth the grounds for a challenge based on implied bias and includes "(f) [t]he existence of a state of mind in the juror evincing enmity against, or bias towards, either party."

Prospective Juror R.R. expressed a marked antipathy toward the legal system and law enforcement in his questionnaire, which the trial court cited as the basis for his exclusion. Responding to a question asking whether something might "distract him during the trial," R.R. marked "YES" and wrote: "I find judges and lawyers pompous and boring." Responding to a question whether the nature of the charges would "make it difficult or impossible for you to be fair and impartial," he answered in the affirmative and wrote: "Obviously (since I haven't heard of the man), the defendant is not rich or famous. Consequently his justice will be harsher than people who

are privileged." R.R.'s negative feelings about the judicial system apparently stemmed from his having been charged with assaulting with a deadly weapon someone he claims was the initial aggressor. R.R. felt that law enforcement's response to that situation was completely inadequate. The trial court also noted that R.R. had indicated he would change his opinion during deliberations if it were late in the day and he was tired because "I get claustrophobic, especially if I feel I couldn't get outside if I wanted to (or if I knew I had to sit still/stay in)." Based on our de novo review, we conclude R.R.'s answers expressed bias against the legal system and law enforcement and indicated his inability to engage in the deliberation process. Accordingly, the trial court did not err in excluding R.R. for cause. (Code Civ. Proc., § 225.)

Although we conclude the trial court did not err in excusing R.R., we also note defendant has cited no authority for his assumption that an error in excusing a juror for reasons unrelated to that juror's view on the imposition of the death penalty requires reversal. " '[T]he general rule [is] that an erroneous exclusion of a juror for cause provides no basis for overturning a judgment.' " (*People v. Holt* (1997) 15 Cal.4th 619, 656 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

(b) *Prospective jurors excused for their attitudes toward the death penalty*

Defendant contends the trial court erred in excusing several prospective jurors, based solely on their questionnaire answers, as being substantially impaired to serve as capital case jurors under *Wainwright v. Witt, supra,* 469 U.S. 412. As noted above, the questionnaire had a special section on attitudes toward the death penalty. For assessing impairment under *Witt* for unwillingness ever to impose the death penalty, the most significant questions were Nos. 54, 56, 58, and 60.

Question No. 54 asked whether the prospective juror's opposition to the death penalty was so strong that, at the guilt phase, no matter what the evidence showed, the juror would refuse to vote for guilt as to first degree murder or would refuse to find a special circumstance true, in order to keep the case from going to the penalty phase. Question No. 56 asked whether the prospective juror's opposition to the death penalty was so strong that, at the penalty phase, the juror would automatically vote against death, no matter what evidence in aggravation or mitigation was presented.

Question No. 58 asked whether the prospective juror was always, never, or sometimes willing to impose the death penalty, depending on the following special circumstances: (A) murder committed for financial gain; (B) defendant previously convicted of murder; (C) defendant convicted of multiple

murders; (D) murder committed upon a peace officer; or (E) murder committed during the course of a robbery.

Question No. 60, the last of the section, asked about the prospective jurors' ability to impose the two options available at the penalty stage. This question first reminded the prospective jurors that under no circumstances were they required to return a penalty of death, and that they would always have the option of choosing life without the possibility of parole. Question No. 60 then presented two subparts, A and B. Part A asked whether, in the appropriate case, the prospective jurors could see themselves rejecting the death penalty and instead choosing life imprisonment without the possibility of parole. Part B asked whether, in the appropriate case, the prospective jurors could see themselves rejecting life imprisonment without the possibility of parole and instead choosing the death penalty.

As to question No. 60, each of the excused prospective jurors marked part A in the affirmative (meaning they were willing to entertain the option of life without the possibility of parole), but marked part B in the negative (meaning they were not willing to entertain the option of imposing the death penalty). Additionally, the excused jurors gave answers to the other pertinent questions, including Nos. 54, 56, or 58, that indicated their unwillingness to apply the death penalty. Finally, as explained below, the excluded jurors further indicated their unwillingness to impose the death penalty in their written explanations to various questions.

Defendant acknowledges that, taken on their own, the answers of the prospective jurors discussed below to the "Attitudes Towards Capital Punishment" section of the questionnaire could suggest impairment under *Wainwright v. Witt, supra*, 469 U.S. 412. But he contends the heart of the *Witt* inquiry actually revolves around question No. 36 in the general section of the questionnaire. Question No. 36 asked: "If the Judge gives you an instruction on the law that you feel is different from a belief or opinion you have, will you be able to follow and apply that instruction?" Defendant contends an affirmative response to question No. 36 should have taken priority over the answers to all of the specific death-penalty attitude questions.[11] Alternatively, defendant contends an affirmative response to question No. 36 at least made it unclear that a prospective juror was categorically unwilling to impose the death penalty, and consequently the trial court should not have excused such a juror without oral voir dire to establish whether the juror was willing to set aside his or her personal views and decide the case according to the law. (See *People v. Wilson, supra*, 44 Cal.4th at p. 789.)

---

[11] All of the excused prospective jurors made an affirmative response to question No. 36, except L.S., who stated "It would be difficult," L.K., who left it blank, and T.T., who put a question mark by it.

We dealt with the same situation in *People v. Wilson, supra,* 44 Cal.4th 758, where the excused juror marked "yes" to a question asking whether, " '[i]f the judge gives you an instruction on the law that differs from your beliefs or opinions, will you follow the law as the judge instructs you?' " (*Id.* at p. 788, fn. 4.) Like the question at issue in *Wilson,* question No. 36 was a general inquiry about willingness to follow the law that preceded the section of the questionnaire specifically devoted to "Attitudes Towards Capital Punishment." As in *Wilson,* question No. 36 was grouped with others in a section testing the prospective juror's ability to follow the law concerning the presumption of innocence, the privilege against compelled self-incrimination, and other principles of law relating to the *guilt* phase of the trial. Therefore, as in *Wilson,* we conclude the prospective jurors' affirmative responses to question No. 36 were not necessarily inconsistent with their responses to the questions in the later section of the questionnaire dealing specifically with attitudes toward the death penalty.

We turn now to the prospective jurors' responses to the questions in the death penalty section of the questionnaire.

Prospective Juror P.C. When answering a question asking her to reveal her "general feelings" about the death penalty, P.C. wrote: "I do not feel we have the right to take a life." In response to another question, she noted her philosophical position regarding the death penalty as "strongly against" and wrote, "we don't have to kill in the name of justice." In response to other questions, she also wrote that she held the position she did on the death penalty because "[t]o take a life is *murder under any circumstance*" (italics added) and that, "I don't feel we have the right to kill." She marked question No. 56 in the affirmative, agreeing that she would automatically vote against death no matter what evidence was presented at the penalty phase. Answering question No. 58, for every listed special circumstance, she marked she would never impose the death penalty and wrote, "We don't not [*sic*] have that right to kill." Answering question No. 60, she marked that she could not see herself choosing the death penalty at the penalty phase.

Prospective Juror L.S. Regarding his general feelings toward the death penalty, L.S. wrote: "It is barbaric! A sad reflection on our supposedly modern 'civilized' society." He further noted his philosophical position as "strongly against" the death penalty. He also wrote: "There's always a possibility a person can make a contribution to society—if he or she is alive—even if it's only to warn the rest of us." Asked whether anything about the death penalty or life imprisonment without parole disturbed him, he wrote: "The defendant very likely needs rehabilitation, not either of the above possibilities." Answering question Nos. 54 and 56, he marked that he was so strongly against the death penalty that he would refuse to vote for guilt as to

first degree murder or refuse to find true a special circumstance, and he would automatically vote against death at the penalty phase. Answering question No. 58, for every listed special circumstance he marked that he would never impose the death penalty. Answering question No. 60, he marked that he could not see himself choosing the death penalty at the penalty phase.

Prospective Juror D.B. D.B. responded that she generally was "an opponent of the death penalty," and that, although she sometimes felt emotionally that certain murderers should die, she was "rationally opposed to the death penalty." Her philosophical position was "strongly against" capital punishment, and she wrote that she did not want " 'the state' having the power to take life." Asked whether anything about the death penalty or life imprisonment without parole disturbed her, she wrote: "Both of them are disturbing. It assumes no possibility for a human to grow, change, amend, or repent. What a hopeless thought!" Answering question No. 56, she marked that she was so strongly against the death penalty she would automatically vote against death at the penalty phase. She also wrote: "I would vote against death. I will not vote for the death penalty." Answering question No. 58, for every listed special circumstance she marked that she would never impose them. Then she wrote, "I would never impose the death penalty," that she hoped she could be like the relatives of murder victims who had recently marched on San Quentin to oppose the death penalty, and concluded, "I will *never* impose the death penalty." (Italics added.) Answering question No. 60, she marked that she could not see herself choosing the death penalty at the penalty phase.

Prospective Juror T.T. Asked about her general feeling toward the death penalty, T.T. wrote: "A life for a life is not the answer." Her philosophical position was strongly against the death penalty, and she explained that she held this position because "I don't believe people should be killed although they have killed." Asked whether anything about the death penalty or life imprisonment without parole disturbed her, she wrote, "The death penalty should *never* be a factor." (Italics added.) Answering question No. 58, for every listed special circumstance, she indicated she would never impose the death penalty. Answering question No. 60, she marked that she could not see herself choosing the death penalty at the penalty phase.

Prospective Juror C.V. Asked about her general feelings toward the death penalty, C.V. wrote: "That life and death belong to God only!" She indicated she was strongly against the death penalty as a philosophical matter and because of her religious beliefs. Asked whether anything about the death penalty or life imprisonment without parole disturbed her, she marked "yes" and wrote, "I'm against the death penalty." Answering question Nos. 54 and 56, she marked that she was so strongly against the death penalty that, regardless of the evidence, she would refuse to vote for guilt as to first degree

murder or refuse to find a special circumstance true, and that she would automatically vote against death at the penalty phase. Answering question No. 58, for every listed special circumstance, she marked that she would never impose the death penalty. For question No. 60, she marked that she could not see herself choosing the death penalty at the penalty phase.

Prospective Juror T.S. Asked about his general feelings toward the death penalty, T.S. wrote: "I do not believe in the death penalty. I would find it very difficult, if I had to make that decision." He indicated he was strongly against the death penalty as a philosophical matter and wrote, "I don't believe anyone has the right to take a human life" and "It's morally wrong." Answering question No. 54, he marked that he was so strongly against the death penalty that, regardless of the evidence, he would refuse to vote for guilt as to first degree murder or refuse to find a special circumstance true in order to keep the case from going to the penalty phase. Answering question No. 58, for the first and last special circumstance of the five listed he marked that he would never impose the death penalty, but he left the middle three blank. As an explanation to question No. 58, he wrote: "I do not believe in the death penalty." Answering question No. 60, he marked that he could not see himself choosing the death penalty at the penalty phase.

Prospective Juror R.S. R.S. indicated that his general feeling was he was "not in favor of the death penalty. Only God has the right to take a life." In response to another question, he reiterated the religious basis for his philosophical position of being "strongly against" the death penalty, further noting that "I believe in God, not man." Asked whether anything about the death penalty or life imprisonment without parole disturbed him, he marked yes and wrote, "I'm not in favor of the death penalty." Answering question Nos. 54 and 56, he marked that he was so strongly against the death penalty that, regardless of the evidence, he would refuse to vote for guilt as to first degree murder or refuse to find a special circumstance true, and that he would automatically vote against death at the penalty phase. Answering question No. 58, for every listed special circumstance, he marked that he would never impose the death penalty. Answering question No. 60, he marked that he could not see himself choosing the death penalty at the penalty phase.

Based on our de novo review of the prospective jurors' responses to the death penalty section of the questionnaire, set out above, we conclude the excused jurors were impaired under *Wainwright v. Witt, supra,* 469 U.S. 412. Therefore, even though some of the excused jurors marked "yes" to question No. 36, the trial court did not err in excusing them without oral voir dire.

(4) *Failure to Dismiss Four Death-leaning Prospective Jurors on Their Questionnaires Alone*

Defendant contends the trial court violated the equal protection clause of the federal Constitution because it applied a different standard for evaluating the questionnaires of those who strongly favored the death penalty than for those who strongly opposed it. Defendant contends that, whereas prospective jurors who expressed strong opposition to the death penalty were excused on the basis of their questionnaires alone, prospective jurors who expressed equally strong sentiments in favor of the death penalty were examined in an oral voir dire. Defendant identifies four "pro-death" prospective jurors, G.G., L.R., E.V., and M.P., who, he contends, should have been dismissed on the basis of their questionnaires alone had the trial court been applying the same standard to "pro-death" prospective jurors that it applied to those who were "pro-life."

Insofar as defendant's equal protection argument implies that the trial court's basic approach to substantial impairment was flawed and that all of the exclusions based on it are suspect, we reject the claim for the reasons discussed above. Insofar as defendant argues the trial court was more inclined to excuse "pro-life" prospective jurors on the basis of their questionnaires alone than it was "pro-death" prospective jurors, defendant fails to show how he was prejudiced. As defendant acknowledges, none of these four assertedly "pro-death" prospective jurors sat on the jury in this case: G.G. was excused for cause and defense counsel exercised peremptory challenges against the other three.

## 2. *Asserted* Batson/Wheeler *Error*

Defendant contends the prosecutor's striking of African-American prospective jurors violated his right to equal protection under the Fourteenth Amendment to the United States Constitution. Defense counsel brought a motion under *Batson v. Kentucky* (1986) 476 U.S. 79, 84–89 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*) after the prosecutor exercised peremptory challenges against three African-American prospective jurors, D.J., R.M., and J.G. The trial court stated that, based on the number of challenges against African-American prospective jurors (three out of nine exercised), defense counsel had stated a prima facie case, and asked the prosecutor to explain his challenges. After hearing the prosecutor's explanations, the trial court denied the motion. On appeal, defendant asserts *Batson/Wheeler* error as to D.J. and R.M. only; he raises no issue on appeal as to the challenge of J.G.

■ Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based solely on group bias. (*Batson, supra,* 476 U.S. at p. 89; *Wheeler, supra,* 22 Cal.3d at pp. 276–277.) The law applicable to *Batson/Wheeler* claims is now familiar. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'" (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions." (*People v. Lenix* (2008) 44 Cal.4th 602, 613 [80 Cal.Rptr.3d 98, 187 P.3d 946].) "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses." (*People v. Burgener* (2003) 29 Cal.4th 833, 864 [129 Cal.Rptr.2d 747, 62 P.3d 1].) As long as the court makes "a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." (*Ibid.*)

Prospective Juror D.J. The prosecutor gave the following reasons for his challenge of D.J. D.J. was a correctional officer, but the prosecutor did not think that being a correctional officer necessarily made someone a good juror. The prosecutor noted that D.J. had worked with both death-sentenced prisoners and prisoners sentenced to life without the possibility of parole (LWOP) and that she indicated in her questionnaire that she considered LWOP to be a more serious punishment than death. The prosecutor was concerned that this indicated a built-in "affinity towards prisoners." He was further concerned that, although she had originally written in her questionnaire that she would always impose the death penalty for each of the special circumstances, during her voir dire, "as soon as she saw that was an issue, she volunteered 'Oh no, what I meant was sometimes,' and she changed all the 'always' to 'sometimes' in her answers." Additionally, although in the questionnaire she said she did not recognize any name on the witness list, she had worked at several of the state prisons where defendant and two prospective witnesses had been incarcerated, specifically Chino and Lancaster. The prosecutor was concerned that when those individuals appeared in court, she might recognize their faces. Finally, in explaining her questionnaire answer that she did not drink alcohol, she had written that she could not "afford to" because there were "too many earthquakes," and she "want[ed] to be in total awareness when the

earth moves." The prosecutor stated that "before she even walked into the courtroom," he had given her a negative rating based on that answer.

In denying defendant's *Batson/Wheeler* motion concerning the challenge of D.J., the trial court explained its ruling as follows: First, because D.J. worked as a correctional officer, it was possible to believe she had "form[ed] a bond" with prisoners. Second, and "more to the point," had defendant and several prospective witnesses been incarcerated at prisons where D.J. had worked, as the prosecutor feared, this would create a problem if D.J. did end up recognizing one of those individuals when they came to court. This, the court concluded, was a "sufficient reason standing alone to excuse somebody from the Department of Corrections." Defendant contends the trial court erred in accepting these two nonracially based reasons as genuine.

Defendant argues first that D.J.'s answers, both in her questionnaire and in her voir dire, indicate a bias toward law enforcement, not prisoners, because D.J. stated she and several of her relatives were longtime employees of the Department of Corrections (now Department of Corrections and Rehabilitation). But the mere possibility that one could draw plausible inferences about D.J. other than those the prosecutor did does not mean the prosecutor's stated reason was pretextual. The trial court made "a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered" and, for that reason, "its conclusions are entitled to deference on appeal." (*People v. Burgener, supra,* 29 Cal.4th at p. 864.)

Second, defendant contends the record contains no evidence that he, Mercurio, or Dalton was incarcerated in a correctional institution during a time D.J. had worked there. Although defendant does not dispute that he, Mercurio, and Dalton had been at Chino and Lancaster, institutions where D.J. had worked, he asserts the prosecutor did not establish D.J.'s dates of service at the institutions precisely enough to support his concern. We disagree. In response to the prosecutor's question during voir dire, D.J. stated she had worked at Chino from 1986 through 1989 and that she was currently working at Lancaster. This information was sufficient to permit the trial court to credit the prosecutor's stated reason.

Prospective Juror R.M. The prosecutor gave two principal reasons for his challenge of R.M. First, he stated that, of all the questionnaires he had read so far, R.M.'s stood out as indicating an "intentional walking of a fine line not to say anything that would get [him] excused." The prosecutor felt R.M. was dancing around the questions and noted that when asked to describe his philosophical opinion regarding the death penalty, R.M. had indicated he was neutral and wrote: "It would depend solely on degree of criminal charges brought against the defendant according to law." The

prosecutor thought R.M.'s answers indicated "he just wanted on this jury," and he stated he was always suspicious of prospective jurors like that.

The second reason the prosecutor mentioned involved the one question to which the prosecutor thought R.M. had given a self-revelatory answer. In response to a question asking whether he or an acquaintance or relative had ever been accused, rightly or wrongly, of a crime, R.M. described being accused of missing a bedcheck in the Army 28 years ago. According to his answer, in July 1968, R.M.'s first sergeant had accused him of missing a bedcheck, but R.M. was found not guilty after further investigation. R.M. wrote he felt "well about the outcome" and added, "at that time, I was very thin and it would have been difficult [to] tell if I were [in] bed or not." The prosecutor stated he was concerned that R.M. had brought up such a minor incident that happened long ago.

In denying defendant's *Batson/Wheeler* motion to the challenge of R.M., the trial court agreed with the prosecutor that R.M. "did appear to be very neutral," but stated also that "[h]e appeared at first blush to be [a] perfectly acceptable juror, and one would wonder in the face of things why anyone would excuse him other than the fact that he was Black." The court observed, however, that the prosecutor had stated a race-neutral reason based on R.M.'s answer "that he was wrongfully accused in the Army." The court noted that although the incident seemed to be a "minor thing," R.M. was "apparently still concerned about it 28 years later." The court concluded that, "having been wrongfully accused, even though it was 20 years ago, is a sufficient, legitimate race-neutral . . . reason for a prosecutor to excuse a potential juror."

Defendant contends the race-neutral reasons the prosecutor offered were implausible and unsupported by the record. We disagree. As to R.M.'s neutrality and lack of self-revealing answers, defendant correctly notes R.M. wrote answers and explanations in his own words where that was called for and that his written comments, although not especially lengthy, covered the subjects the questions addressed. The prosecutor's main point, however, was that he felt R.M. did not reveal his attitudes in what he wrote, not that he failed to write anything in his questionnaire. As to the bedcheck incident, defendant notes the questionnaire asked very specific things about any accusation of a crime ("What crime?" "What happened?" "Was there a trial?" "If so, how do you feel about what happened?") and contends that R.M. was simply answering the questions put to him by the questionnaire. But as we noted in the prior discussion, the mere possibility one could interpret R.M.'s account of the bedcheck incident in a different light does not render the prosecutor's reason pretextual. Once again, the trial court made "a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered"

and, for that reason, "its conclusions are entitled to deference on appeal." (*People v. Burgener, supra*, 29 Cal.4th at p. 864.)

Finally, the trial court noted that at the time of the *Batson/Wheeler* motion there were still two African-Americans left in the group of 11 prospective jurors seated in the jury box.[12] " 'While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection.' " (*People v. Stanley* (2006) 39 Cal.4th 913, 938, fn. 7 [47 Cal.Rptr.3d 420, 140 P.3d 736].)[13]

### 3. *Denial of Motion to Suppress*

Defendant contends the trial court erred in denying his motion under section 1538.5 to exclude from evidence the two duffel bags and the jacket police found on September 25, 1991, when they searched his mother's car. As recounted above, one of the duffel bags and the jacket found in the other bag were identified at trial as Gitmed's property. Defendant contends the search violated the Fourth Amendment to the United States Constitution because police lacked both a warrant and probable cause for the search.

### a. *Factual and procedural background*

At the suppression hearing, two officers involved in the search, Betty Fitzpatrick and Donna Martinez, testified. Fitzpatrick was assigned to investigate Gitmed's death. The investigation began after the discovery of an unidentified body at Canyon Lake on August 28, 1991. On September 11, Michelle Keathley identified the body as Gitmed and indicated he was last

---

[12] Two African-American jurors ultimately served on defendant's jury. At the time the defense and the prosecution accepted the jury panel, the prosecutor had used 10 of the 20 peremptory challenges he was entitled to exercise under Code of Civil Procedure section 231, subdivision (a).

[13] At oral argument, appellate counsel for the first time referred to the juror questionnaires of the following 13 seated or alternate jurors: J.G., D.K., C.M., L.M., T.M., W.M., S.N., D.P., L.R., M.R., D.N., M.S., and Y.Y. Counsel argued that for a few questionnaire items the above jurors gave answers that were the same as or similar to those of Prospective Jurors D.J. and R.M., suggesting this allegedly disparate treatment revealed the prosecutor's stated reasons for excusing D.J. and R.M. were pretextual. (See *People v. Lenix, supra*, 44 Cal.4th 602 [comparative juror analysis properly considered when evaluating a third stage *Batson* claim].) Because counsel failed to raise this comparative juror argument in her briefs, to raise it at oral argument was improper. (See *People v. Niles* (1964) 227 Cal.App.2d 749, 758 [39 Cal.Rptr. 11].) Nevertheless, we have considered the comparative juror argument on the merits and examined the record, and we are not persuaded the questionnaire answers from the identified 13 jurors or alternate jurors raise a reasonable inference that the prosecutor's stated reasons for challenging D.J. and R.M. were pretextual.

seen in defendant's company. This led the police, on September 13, to conduct a parole search of the house of Jean Thompson Churder (defendant's mother), where defendant lived. They seized no evidence in this search. On September 14, the police received information from Betty Abney, the roommate of Eva Thompson (defendant's sister). Abney had read or heard about defendant's involvement in a crime, and she told the police that items belonging to defendant had been removed from the apartment she shared with Thompson and sent to Churder's house. After Officer Fitzpatrick spoke to Abney, she interviewed Mercurio on September 17, and Mercurio told her he had seen defendant shoot and kill Gitmed and that defendant had obtained Gitmed's personal property.

On September 25, Officer Fitzpatrick and other officers went to Churder's house to serve a search warrant for the items belonging to defendant that Abney said had been removed from Thompson's apartment. Churder was not at home, but her daughter Gina was. When the search of the house proved fruitless, the officers asked Gina about two bags and a box, which were the items they were searching for. Gina told Officer Fitzpatrick the items were in the trunk of her mother's car, and she was expecting her mother to return to the house with the car. Officer Fitzpatrick conveyed this information to Officer Martinez, who participated in the search of Churder's car when Churder returned and parked the car in the driveway. Officer Martinez opened the trunk and seized two duffel bags. Michelle Keathley arrived and at the officers' request identified one of the bags, a black, blue, and white nylon duffel bag, as belonging to Gitmed. Officer Martinez searched the contents of both bags. Martinez did not recall whether she opened the bags before or after Keathley arrived. Keathley did not recognize the second bag, but identified a jacket in that second bag as Gitmed's.

The prosecutor stipulated that no search warrant existed for the car from which the items were removed, but argued the suppression motion should be denied for two reasons: (1) defendant had no standing to contest the search of the car because it belonged to his mother, not to him; and (2) police had probable cause to conduct a warrantless search of the car and the containers within it under *California v. Acevedo* (1991) 500 U.S. 565 [114 L.Ed.2d 619, 111 S.Ct. 1982]. The trial court accepted both arguments and denied defendant's motion to suppress.

b. *Analysis*

In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. (*People v. Hoyos* (2007) 41 Cal.4th 872, 891 [63 Cal.Rptr.3d 1, 162 P.3d 528].) We review the

court's resolution of the factual inquiry under the deferential substantial evidence standard. Whether the relevant law applies to the facts is a mixed question of law and fact that is subject to independent review. (*Ibid.*) Applying these standards, we discern no error in the trial court's denial of defendant's motion to suppress.

■ Defendant does not challenge the trial court's ruling that he lacked standing to contest the search of the car, but claims that because police lacked probable cause to search the duffel bags found in the trunk, the trial court should have granted his suppression motion to that extent and excluded from evidence Gitmed's jacket found in one of the bags. Defendant acknowledges the warrantless search and seizure of the bags was controlled by *California v. Acevedo*, in which the high court held: "The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." (*California v. Acevedo, supra*, 500 U.S. at p. 580.) He contends, however, the officers did not have probable cause to search the bags because the facts presented at the suppression hearing showed only that items belonging to him had been moved from Thompson's apartment to Churder's house. These facts, he contends, failed to show a connection between the bags and Gitmed's murder. Defendant's argument, however, ignores Mercurio's information, which provided a critical connection between the items defendant stored at Thompson's apartment and the murder. Before the September 25 search, Mercurio told the police that defendant had killed Gitmed and obtained Gitmed's personal property, and Officer Fitzpatrick had conveyed this information to Officer Martinez, thus providing probable cause for Officer Martinez to search the car's containers for the items.

## C. Trial Issues

### 1. Asserted Insufficiency of the Evidence for First Degree Murder

Defendant contends his first degree murder conviction violates his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution because it is not supported by sufficient evidence. At trial, the prosecutor advanced two theories of first degree murder: premeditated and deliberate murder, and felony murder, with the further alternative for each theory that defendant was either a direct perpetrator or an aider and abettor. Defendant contends the record contains insufficient evidence to support a conviction of first degree murder under any theory. As discussed below, we disagree.

### a. Sufficiency of the evidence defendant was the direct perpetrator

Defendant argues the record contains insufficient evidence to convict him of first degree murder as the direct perpetrator. The relevant law is well established. " ' " '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Halvorsen, supra,* 42 Cal.4th at p. 419.) The standard is the same under the state and federal due process clauses. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1082–1083 [25 Cal.Rptr.2d 867, 864 P.2d 40].) "We presume ' "in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.] This standard applies whether direct or circumstantial evidence is involved.' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1251 [57 Cal.Rptr.3d 543, 156 P.3d 1015].)

The prosecution's main evidence was Mercurio's testimony that defendant robbed and shot Gitmed. Defendant contends Mercurio's testimony of itself was insufficient to support his conviction as the direct perpetrator and that evidence of his actions *after* the shooting cannot support the conviction. Considered in isolation, he argues, his actions after the crime merely support the conclusion he was an accessory after the fact. We are not, however, limited to considering his postcrime actions in isolation.

In the context of the sufficiency of the evidence to support a finding of premeditated and deliberate murder, we have noted that evidence of a defendant's attempts to conceal the crime by cleaning up the crime scene or telling false stories "is highly probative of whether defendant committed the crime, but it does not bear upon the state of the defendant's mind at the time of the commission of the crime." (*People v. Anderson* (1968) 70 Cal.2d 15, 33 [73 Cal.Rptr. 550, 447 P.2d 942].) While our comment in *Anderson* thus warns against using evidence of a defendant's postcrime actions and statements as the sole support for upholding a finding of premeditated and deliberate murder, such postcrime actions and statements can support a finding that defendant committed a murder for which his specific mental state is established by his actions before and during the crime. In the week following the shooting, defendant, with Mercurio's help, methodically disposed of Gitmed's property. That defendant knew the location of and entry code to Gitmed's storage facility reasonably supports the inference he gained that information from Gitmed before the murder as part of a plan to obtain Gitmed's property after he killed him.

Other postcrime evidence supports defendant's guilt as the actual perpetrator of the murder. Charlene Triplett saw defendant cleaning a gun, which supports the inference he had brought and used the gun that killed Gitmed. When after the shooting defendant returned to Michelle Keathley's house to retrieve his bicycle, he gave conflicting stories about Gitmed's whereabouts. When interviewed by the police on September 13, 1991, he acknowledged having met Gitmed at Michelle Keathley's house, but denied leaving the house with him. He told Barbara Triplett about a man floating in Canyon Lake who was not able to make decisions for himself, and boasted to Danny Dalton about leaving someone floating in the lake. Charlene Triplett heard defendant implore Mercurio to get Charlene and her family to go along with "our story." Defendant's postcrime actions and statements clearly support the conclusion he was the direct perpetrator of the murder.

### (1) *Premeditated Murder*

Defendant contends the evidence was insufficient that he premeditated Gitmed's murder because nothing in Mercurio's testimony established that he acted other than impulsively in shooting Gitmed. Defendant notes Mercurio testified he was surprised when he heard shots and, just before the shooting, defendant raised his voice in an increasing volume. Defendant contends the only reasonable conclusion this testimony supports is that he shot Gitmed in the anger of the moment.

■ We disagree. At best, defendant establishes only that, based on Mercurio's testimony, a reasonable jury could have concluded defendant shot the victim in anger and without premeditation. But as we have noted, "[i]f the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139 [17 Cal.Rptr.2d 375, 847 P.2d 55].) The evidence here reasonably supports a finding of premeditation. " 'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*People v. Osband* (1996) 13 Cal.4th 622, 697 [55 Cal.Rptr.2d 26, 919 P.2d 640].) Mercurio testified that as defendant's voice grew louder and angrier, defendant was ordering Gitmed to take off his clothes. The jury reasonably could have inferred from these facts that, before shooting Gitmed, defendant had decided to rob him and, further, that he had decided to kill him after robbing him.

Gitmed was killed by three gunshot wounds, one of which was immediately fatal. Mercurio testified defendant was just a few feet from Gitmed when he shot him. This manner of killing, a close-range shooting without any

provocation or evidence of a struggle, reasonably supports an inference of premeditation and deliberation. (*People v. Marks* (2003) 31 Cal.4th 197, 230 [2 Cal.Rptr.3d 252, 72 P.3d 1222].)

Other evidence at trial, moreover, reasonably supports the inference that defendant lured Gitmed to an isolated area to rob and kill him as part of a plan to obtain all his worldly possessions. Testimony at trial supports the inference that defendant had planned to kill Gitmed as early as when he convinced Gitmed to leave Michelle Keathley's house with him. Defendant had no car at that time and, as Eric Arias testified, defendant had previously offered Arias money to give him a ride to the Lake Elsinore area to collect a debt and mentioned he would be bringing a gun. After Arias backed out of the agreement, defendant made a similar offer to Gitmed, who accepted. A reasonable jury could have inferred that defendant, after persuading Gitmed to accompany him, planned to rob him and kill him for his car when the opportunity presented itself. A further reasonable inference is that defendant brought along the gun he had mentioned to Eric Arias.

Testimony established that defendant persuaded Gitmed to drive to the Triplett compound, where Mercurio was staying. A reasonable jury could have inferred that defendant brought Gitmed to Mercurio, whom defendant had met in prison, in order to obtain Mercurio's assistance in committing the robbery and murder. Later that night, Mercurio drove defendant and Gitmed to an isolated area of Canyon Lake. A reasonable inference is that defendant had planned to get Gitmed to a remote area where he could carry out the robbery and murder without hindrance and without detection.

■ In sum, the record contains ample evidence to support defendant's conviction of first degree premeditated murder.

### (2) *Felony Murder*

■ One who unlawfully kills a human being during the commission of a robbery or an attempted robbery is guilty of first degree murder under the felony-murder rule. (*People v. Young* (2005) 34 Cal.4th 1149, 1175 [24 Cal.Rptr.3d 112, 105 P.3d 487]; §§ 187, 189.) "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Defendant contends there was insufficient evidence that, at the time of the shooting, Gitmed was in possession of any property or that defendant took any property from him. Defendant's argument ignores the substantial evidence from which a reasonable jury could find the killing occurred during the commission of a robbery. Mercurio's testimony provided direct evidence that defendant took personal items from Gitmed before killing

him. Mercurio testified that before the shooting defendant told Gitmed to take off his clothes, which he did, and that after the shooting defendant returned to the truck and threw some things into the back of it, including Gitmed's clothing and some small items that might have been Gitmed's wallet or some change. Gitmed's body was found with no shirt or jacket, which further supports the inference that personal items were taken from him.

Defendant contends Mercurio's trial testimony establishing the robbery contradicted his testimony before the grand jury, which defense counsel read into the record as impeachment. However, Mercurio's grand jury testimony constituted, if anything, even stronger evidence that defendant had taken personal items from Gitmed. Before the grand jury, Mercurio testified that after defendant pointed a gun at Gitmed, Gitmed started taking off his clothes and removed items from his pockets, such as his wallet and change, and handed them to defendant, who placed them on the hood of the truck. Mercurio's grand jury testimony therefore did not conflict with his trial testimony; rather, it included some details (such as Gitmed's removing items from his pockets) that he did not recount at trial, but that were consistent with his trial testimony. Even if Mercurio's grand jury testimony was inconsistent, it was admitted for its truth. (See Evid. Code, § 1235.) Therefore, whether the jury accepted Mercurio's trial testimony exclusively, his grand jury testimony exclusively, or a combination of both, the testimony provided substantial evidence that a robbery took place.

b. *Sufficiency of the evidence for aiding and abetting*

Defendant argues the record contains insufficient evidence to convict him as an aider and abettor to first degree murder on either a felony-murder or a premeditated-and-deliberate-murder theory. Because the jury found the allegation of personal gun use to be untrue, he contends, one or more jurors must have relied on an aider and abettor theory of liability, and the asserted insufficiency of the aider and abettor evidence therefore compels reversal. In the next part, we address and reject defendant's contentions about the significance of the jury's "not true" finding on the personal gun use allegation. In this part, we conclude the record discloses substantial evidence to support a conviction based on aider and abettor liability.

(1) *Aider and Abettor to Felony Murder*

Principals include those who "aid and abet" in the "commission of a crime." (§ 31.) "Aider and abettor liability is premised on the combined acts of all the principals, but on the aider and abettor's own mens rea." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1120 [108 Cal.Rptr.2d 188, 24 P.3d 1210].) We have defined the required mental states and acts for aiding and abetting

as: "(a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225 [29 Cal.Rptr.3d 423, 113 P.3d 100].) Under the felony-murder rule, an accomplice is liable for killings occurring while the killer was acting in furtherance of a criminal purpose common to himself and the accomplice, or while the killer and the accomplice were jointly engaged in the felonious enterprise. (*People v. Pulido* (1997) 15 Cal.4th 713, 719 [63 Cal.Rptr.2d 625, 936 P.2d 1235].) In order to support defendant's conviction as an aider and abettor, therefore, the record must contain substantial evidence that (a) Mercurio committed the robbery (the perpetrator's actus reus), (b) defendant knew Mercurio's intent to rob and intended to assist in the robbery (the aider and abettor's mens rea), and (c) defendant engaged in acts that assisted the robbery (the aider and abettor's actus reus).

As discussed above, the condition of Gitmed's body supports the inference a robbery took place. Mercurio's testimony stands as direct evidence that defendant committed the robbery, but it also provides circumstantial evidence that Mercurio could have committed the robbery, because it establishes that Mercurio was with Gitmed and defendant when Gitmed was robbed and killed. (See 1 Witkin, Cal. Evidence (4th ed. 2000) Circumstantial Evidence, § 2, p. 322 [testimony may be direct evidence of one fact, but also circumstantial evidence of another fact].) In his testimony, Mercurio cast himself in the best possible light, stating he was completely ignorant of defendant's plan to rob and kill and was shocked when it happened. But other evidence at trial supports the inference that Mercurio was an accomplice in the robbery and shooting. In their testimony, Danny Dalton and Charlene Triplett described Mercurio as an all-too-willing and apparently equal participant with defendant in obtaining and disposing of Gitmed's property after the shooting. Although their testimony does not speak to whether Mercurio was the shooter, it is consistent with the conclusion that Mercurio was more involved in the crime than he testified and that he may have been an accomplice with defendant in the robbery and murder.

Defendant contends "there is no such thing as aiding and abetting each other" and, therefore, absent direct evidence Mercurio shot Gitmed, the evidence is insufficient to convict defendant as an aider and abettor. Defendant argues that even assuming Mercurio was the actual shooter, no evidence supports the conclusions that defendant knew Mercurio was going to rob Gitmed, that defendant himself harbored the intent to deprive Gitmed of his property, or that defendant did anything to aid Mercurio in accomplishing the robbery. We disagree. As we have stated, a sharp line does not always exist between the direct perpetrator and the aider and abettor: "It is often an

oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor. When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator. . . . [O]ne person might lure the victim into a trap while another fires the gun; in a stabbing case, one person might restrain the victim while the other does the stabbing. In either case, both participants would be direct perpetrators as well as aiders and abettors of the other. The aider and abettor doctrine merely makes aiders and abettors liable for their accomplices' actions as well as their own. It obviates the necessity to decide who was the aider and abettor and who the direct perpetrator or to what extent each played which role." (*People v. McCoy*, *supra*, 25 Cal.4th at p. 1120.)

The same evidence discussed above as supporting the conclusion that defendant premeditated the robbery and killing also supports the conclusion that defendant and Mercurio were coperpetrators in the robbery and killing. The evidence reasonably supports the inference that, after defendant brought Gitmed to the compound, Mercurio and defendant jointly maneuvered to bring him to an isolated spot at Canyon Lake where both participated in the robbery and murder. Regardless of whether one concludes the actual shooter was defendant or Mercurio, the evidence supports the conclusion the two were coperpetrators in the crimes. (See *People v. McCoy*, *supra*, 25 Cal.4th at p. 1120.) And regardless of who was the actual shooter, the evidence reasonably supports the inference that defendant assisted the robbery and murder by providing the gun; as Eric Arias testified, defendant had said he was going to bring a gun and, as Charlene Triplett testified, defendant was cleaning a gun the day after the shooting.

### (2) *Aider and Abettor to Premeditated Murder*

Defendant contends insufficient evidence supports his first degree murder conviction based on the theory he aided and abetted Mercurio in committing premeditated murder. Defendant contends the evidence shows, at most, that he willingly went along with Mercurio and Gitmed for a ride in the truck, but had no idea Mercurio intended to kill Gitmed. We disagree. The substantial evidence supporting defendant's guilt as an aider and abettor to premeditated murder is essentially the same as that supporting the theory he aided and abetted the felony murder. As discussed in detail in the previous part, the evidence reasonably supports the inference that defendant intentionally maneuvered Gitmed into going to an isolated area where defendant and Mercurio carried out their plan to rob and kill him. Assuming defendant was not the actual shooter, the evidence reasonably supports the inferences that he acted as an accomplice to a premeditated murder and that he supplied the gun used to commit the murder.

c. *Significance of the split verdict*

As noted, the jury found defendant guilty of first degree murder and found true the robbery-murder special-circumstance allegation, but found not true the personal gun use allegation. Defendant contends this "split verdict" shows that one or more jurors must have rejected his guilt as the actual shooter and instead found him guilty as an aider and abettor. Because there was insufficient evidence for the aider and abettor theory, he argues, his conviction must be reversed. In the previous part, we rejected defendant's contention that the evidence was insufficient to convict him as an aider and abettor. But even were we to assume the evidence was insufficient, the split verdict does not show that the jury relied on an aider and abettor theory.

"Where the jury considers both a factually sufficient and a factually insufficient ground for conviction, and it cannot be determined on which ground the jury relied, we affirm the conviction unless there is an affirmative indication that the jury relied on the invalid ground." (*People v. Marks, supra,* 31 Cal.4th at p. 233.) We review the entire record in determining whether there is such an affirmative indication. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130 [17 Cal.Rptr.2d 365, 847 P.2d 45].)

In *People v. Santamaria* (1994) 8 Cal.4th 903 [35 Cal.Rptr.2d 624, 884 P.2d 81], we considered what implications could be drawn from a split verdict in determining whether an issue had been "necessarily decided" for the purposes of collateral estoppel. (*Id.* at p. 917.) In *Santamaria,* the defendant was charged with murder, a robbery-murder special circumstance, and the allegation that he had personally used a knife in the commission of the crime. The main witness was a companion who had been charged with and convicted of being an accessory to the murder. (*Id.* at pp. 908–909.) The jury convicted the defendant of murder and robbery and found true the special circumstance, but found not true the personal knife use allegation. (*Id.* at p. 909.) The Court of Appeal reversed the judgment, finding prejudicial error in an 11-day continuance the trial court had granted during deliberations. The issue on retrial was whether the doctrine of collateral estoppel prevented the prosecutor from proceeding again on the theory that the defendant was the direct perpetrator, since the first jury had found the personal knife use allegation to be untrue. (*Ibid.*)

We held collateral estoppel did not preclude retrial on a direct perpetrator theory because the "not true" verdict on the personal knife use allegation was "of far less significance" than the defendant had contended. (*People v. Santamaria, supra,* 8 Cal.4th at p. 919.) We explained: "It shows only that there was a reasonable doubt in the minds of the jurors that defendant specifically used a knife. *It does not show the reverse, that the jury*

*specifically found defendant was an aider and abettor. . . .* The jury may merely have believed, and most likely did believe, that defendant was guilty of murder as either a personal knife user or an aider and abettor but *it may have been uncertain exactly which role defendant played.* That, too, would fully explain, and necessitate, the split verdict." (*Ibid.*)

Although defendant's claim does not involve collateral estoppel, our observations in *Santamaria* apply to his contention that the jury's failure to sustain the personal gun use allegation is an affirmative indication it relied on an aider and abettor theory to convict him of murder. As in *Santamaria*, the jury in defendant's case likely believed defendant was guilty of murder *either* as the actual shooter or as an aider and abettor, but may have been uncertain as to the exact role he played. As previously discussed, the evidence reasonably supports the inference that both Mercurio and defendant planned and carried out the robbery and murder. Mercurio placed all the blame on defendant, but from the other evidence presented at trial the jury could reasonably have inferred Mercurio was a coperpetrator in the crimes. The jury's uncertainty as to the exact roles each played could explain its failure to sustain the gun use allegation. The jury's finding on the gun use allegation does not necessarily demonstrate it based its murder verdict on an aider and abettor theory. (*People v. Marks, supra,* 31 Cal.4th at p. 233.)

### d. *Assertedly erroneous instruction on aiding and abetting*

In a claim related to his contention that the evidence was insufficient to convict him on an aider and abettor theory, defendant contends the trial court erred in instructing the jury on aiding and abetting because the evidence supported a conviction only on a direct perpetrator theory. Because we reject defendant's contention the evidence was insufficient to convict him on an aider and abettor theory, we also reject this related argument.

### e. *Asserted prosecutorial misconduct*

 Defendant contends the prosecutor engaged in misconduct during closing argument by misstating the law and the evidence. "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; see *People v. Cash* (2002) 28 Cal.4th 703, 733 [122 Cal.Rptr.2d 545, 50 P.3d 332].) Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial. [Citation.] In order to preserve a claim of misconduct, a defendant must make a timely objection

and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review." (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328 [63 Cal.Rptr.3d 433, 163 P.3d 118]; see *People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].) When a claim of misconduct is based on the prosecutor's comments before the jury, " '.'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 960 [86 Cal.Rptr.2d 243, 978 P.2d 1171].)

Defendant acknowledges trial counsel failed to object to any of the asserted misconduct he now raises, and he fails to indicate why an admonition would not have cured the asserted harm. His claims therefore are forfeited for purposes of appeal.[14] Furthermore, as we conclude below, were we to excuse this forfeiture and address the substance of his claims, we would find them meritless because no misconduct occurred.

Defendant complains of the prosecutor's statements regarding his culpability as an aider and abettor to felony murder, such as: "All that needs to be proven is that the defendant was involved in a robbery and that someone was killed during the course of the robbery." Defendant contends the prosecutor's use of the term "involved" set a lower bar for his culpability and lightened the prosecutor's burden of proof. We disagree. The prosecutor did not purport to give the jury a definition of aiding and abetting that was different from the one the court had just given. The court had instructed that "[a] person aids and abets the commission of a crime when he or she, with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice, promotes, encourages, or instigates the commission of the crime." The court further instructed that "[m]ere presence at the scene of the crime which does not itself assist the commission of the crime does not amount to aiding and abetting." Viewed within the context of his entire argument, the prosecutor's discussion of defendant's liability as an aider and abettor to felony murder was consistent with the instructions the trial court gave. There was no reasonable likelihood the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*People v. Smithey, supra*, 20 Cal.4th at p. 960.)

---

[14] Anticipating we would find these claims forfeited, defendant contends they are still cognizable on appeal under the rubric of ineffective assistance of counsel based on counsel's failure to object. As we discern no misconduct on the merits, defendant's ineffective assistance claim fails. We reiterate, however, that a defendant cannot automatically transform a forfeited claim into a cognizable one merely by asserting ineffective assistance of counsel. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1202–1203 [96 Cal.Rptr.2d 1, 998 P.2d 969].)

Defendant also contends the prosecutor misrepresented the evidence. In discussing the apparent senselessness of the murder, the prosecutor distinguished between understanding a motive for the murder and understanding why anyone would have committed such a cruel and senseless act. The prosecutor stated that defendant's apparent motive for the robbery was that he wanted Gitmed's possessions, such as the car and the duffel bag, but recognition of that apparent motive does not make the crime any less senseless. Defendant objects to the prosecutor's reference to the car and the bag, because these items were in defendant's possession *after* the shooting and no evidence established that he took either from Gitmed's immediate presence during the robbery. The prosecutor, however, was not arguing that the car and bag were items taken during the robbery but, rather, that defendant's apparent motive was his desire to take Gitmed's possessions, including those, such as the car and the bag, that were not on his person at the time of the robbery. As discussed above in connection with the sufficiency of the evidence to support premeditated murder, this was a reasonable characterization of the evidence..

> f. *Asserted ineffective assistance of counsel for failure to exclude evidence of the wallet*

In a contention related to his claim of insufficiency of the evidence, defendant argues defense counsel was ineffective for failing to move to exclude evidence that police found a wallet in defendant's room during the September 25, 1991, search of his mother's house. Defendant contends evidence of the wallet was irrelevant under Evidence Code section 350 or was more prejudicial than probative under Evidence Code section 352 and, if defense counsel had moved to exclude it under these grounds, the trial court would have been compelled to grant the motion.

"To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " (*People v. Kipp* (1998) 18 Cal.4th 349, 366 [75 Cal.Rptr.2d 716, 956 P.2d 1169], quoting *Strickland v. Washington, supra,* 466 U.S. at p. 686.) Preliminarily, we note that rarely will an appellate record establish ineffective assistance of counsel. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267–268 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) On this record we see none. Counsel is not ineffective for failing to make frivolous or futile motions. (*People v. Memro* (1995) 11 Cal.4th 786, 843 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) Contrary to defendant's contention that the wallet was

irrelevant because no evidence showed it belonged to Gitmed, Marc Brendlin, Thompson's son, provided testimony from which the jury could have inferred the wallet belonged to Gitmed. Brendlin testified that a wallet containing business cards but no identification was among the items defendant left at Thompson's house. Brendlin moved the items to Churder's house along with Gitmed's duffel bag and jacket. Because the jury could reasonably have inferred the wallet thus belonged to Gitmed, counsel was not remiss in failing to object to the wallet's admission into evidence.

### 2. *Challenges to the Validity of Mercurio's Testimony*

Defendant contends his convictions violate his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution because they are based on insufficient evidence, namely, the uncorroborated testimony of Mercurio, who was an accomplice. Alternatively, defendant contends Mercurio's testimony cannot support a conviction because it was inherently incredible. Neither contention has merit.

### a. *Corroboration of accomplice testimony*

Section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

The jury was instructed with CALJIC Nos. 3.10, 3.11, 3.12, 3.18, and 3.19, which defined an accomplice, instructed the jury to determine whether Mercurio was an accomplice, and set forth the standard for determining whether accomplice testimony was corroborated. Defendant does not contend the jury was misinstructed, nor that it should have been instructed under CALJIC No. 3.16 that Mercurio was an accomplice as a matter of law. Rather, defendant contends the jury's "not true" finding on the personal gun use allegation indicates the jury must have found Mercurio to be an accomplice, and that his testimony was uncorroborated. As discussed above, we reject defendant's contentions about the split verdict's meaning. Assuming, however, for the sake of argument that the jury found Mercurio was a mere accomplice, we conclude below that sufficient evidence corroborated his testimony under the standards of section 1111.

" 'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not

have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.' " (*People v. Abilez* (2007) 41 Cal.4th 472, 505 [61 Cal.Rptr.3d 526, 161 P.3d 58].) " 'The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime. The corroborating evidence need not by itself establish every element of the crime, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime.' " (*Ibid.*)

As discussed in detail above, ample evidence corroborated Mercurio's testimony and connected defendant with the crime: Michelle Keathley established the connection between defendant and Gitmed, testifying that they left her house together and that defendant returned to her house without Gitmed and gave suspicious and contradictory accounts about Gitmed's absence. Charlene Triplett's testimony established that defendant and Gitmed were together at the compound, that they left that night with Mercurio in the red truck, that defendant was driving Gitmed's car after that night, and that defendant was burning papers by the trash dumpster and cleaning a gun. Barbara Triplett and Danny Dalton testified to defendant's incriminating statements about a person floating in Canyon Lake. The physical evidence, to which various witnesses testified, also corroborated Mercurio's testimony. Gitmed's body was found without a shirt or jacket, corroborating Mercurio's account that defendant took these items before shooting him. The contents of Gitmed's stomach corroborated Mercurio's account of the hamburger and french fries dinner the group ate at the compound. The presence of methamphetamine in Gitmed's blood confirmed Mercurio's account that he, defendant, and Gitmed had ingested the methamphetamine Gitmed brought with him that night. In short, ample evidence corroborated Mercurio's testimony.

### b. *Inherently incredible testimony*

Alternatively, defendant contends Mercurio's testimony was "inherently incredible" because it described events that were physically impossible. The standard for rejecting a witness's statements on this ground requires " ' "either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." ' " (*People v. Barnes* (1986) 42 Cal.3d 284, 306 [228 Cal.Rptr. 228, 721 P.2d 110].) Defendant points to (1) the angle of the bullet wounds in Gitmed's body as contradicting Mercurio's testimony regarding where defendant stood when he shot Gitmed, and (2) that Gitmed's body was found in the water, although Mercurio testified at trial he did not see the body fall into the water. But Mercurio's testimony did not recount facts that were physically impossible, nor did it exhibit falsity on its face. Rather, defendant's contention that Mercurio's

testimony was inherently incredible depends on the asserted inconsistencies that defendant argues exist between Mercurio's testimony and other evidence presented at trial. We reject defendant's attempt to reargue the evidence on appeal and reiterate that "it is not a proper appellate function to reassess the credibility of the witnesses." (*People v. Jones* (1990) 51 Cal.3d 294, 314–315 [270 Cal.Rptr. 611, 792 P.2d 643].)

### 3. Challenges to the Finding on the Robbery-murder Special-circumstance Allegation

#### a. Sufficiency of the evidence

Defendant contends the jury's finding on the robbery-murder special-circumstance allegation violates his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution because insufficient evidence supported it. Specifically, he contends there was no support in the record for the first two elements of a robbery, namely, that at the time of the shooting Gitmed was in possession of any personal property and that defendant or Mercurio took any property from him. Defendant further contends there was no substantial evidence of defendant's conduct or mental state as an aider and abettor or of a relationship between the murder and the robbery. As defendant acknowledges, these contentions are identical to those discussed above, about the asserted insufficiency of the evidence to support a theory of felony murder based on robbery, and we reject them for the same reasons discussed there. In this part, we discuss and reject defendant's contentions based on the statutory language of the robbery-murder special-circumstance allegation.

Section 190.2, subdivision (d) provides that, for the purposes of those special circumstances based on the enumerated felonies in paragraph (17) of subdivision (a), which include robbery, an aider and abettor must have been a "major participant" and must have acted "with reckless indifference to human life."[15] (§ 190.2, subd. (d); 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Crimes, § 110, p. 167; see 3 Witkin & Epstein, Cal. Criminal Law, *supra*, Punishment, § 460, pp. 613–614.) Repeating his earlier argument, defendant contends the split verdict means the jury found he

---

[15] Section 190.2, subdivision (d) provides in full: "Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."

was not the actual killer, and it therefore must have found the robbery-murder special-circumstance allegation true based on his aider and abettor liability. Defendant contends the record contains insufficient evidence to support his liability as an aider and abettor under section 190.2, subdivision (d).

For the reasons previously discussed, we reject defendant's contention that the split verdict means the jury convicted him on an aider and abettor theory. But even assuming the jury found the special circumstance allegation true on that theory, we conclude there was substantial evidence to support the conclusion that defendant was an aider and abettor who, at the least, was a major participant who acted with reckless indifference to human life. As discussed, the evidence supports the conclusion that, after defendant brought Gitmed to the compound, defendant and Mercurio jointly maneuvered to bring him to an isolated spot at Canyon Lake where both participated in the robbery and murder. The evidence of defendant's actions both before and after the murder supports the conclusion defendant intended to obtain Gitmed's possessions by killing him or having Mercurio kill him.

Defendant points to the requirement of section 190.2, subdivision (a)(17) that the murder must have been committed during the "commission" of the underlying felony, which we have interpreted to mean that, when the underlying felony is only "incidental to the murder, the murder cannot be said to have been committed in the commission of the related offense." (*People v. Williams* (1988) 44 Cal.3d 883, 927 [245 Cal.Rptr. 336, 751 P.2d 395].) Defendant contends it is at least reasonably probable that items were taken from Gitmed to prevent identification of his body, and therefore the robbery was only incidental to the murder. But as discussed above, substantial evidence supports the conclusion that Gitmed was robbed and that defendant had planned to rob him as part of a larger plan to obtain his possessions after killing him. When the evidence supports the jury's findings, a reviewing court may not reverse the judgment because the evidence might also support a contrary finding. (*People v. Ceja, supra,* 4 Cal.4th at p. 1139.) Defendant's claim therefore fails.

### b. *Prosecutorial misconduct*

Defendant contends the prosecutor engaged in misconduct in closing argument by making erroneous or misleading comments about the robbery-murder special-circumstance allegation. Defense counsel did not object in any of the instances that defendant challenges, and thus all appellate claims based on them are forfeited.[16] (*People v. Alfaro, supra,* 41 Cal.4th at p. 1328.) We

---

[16] Anticipating we would find these claims forfeited, defendant, as before, contends they are still cognizable on appeal under the rubric of ineffective assistance of counsel based on counsel's failure to object. As we discern no misconduct, defendant fails to establish his

also reject defendant's contentions on the merits. When a claim of misconduct is based on the prosecutor's comments before the jury, as are all of defendant's claims here, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Smithey, supra,* 20 Cal.4th at p. 960.) As discussed below, we conclude there is no reasonable likelihood the jury so construed any of the prosecutor's challenged comments.

First, defendant challenges the prosecutor's rather oblique statement that "[t]he only difference between concluding that the defendant premeditated and there was a deliberate murder of Ron Gitmed by the defendant is by the special circumstance." Defendant contends the prosecutor meant there were two kinds of murder for the jury to consider, premeditated murder and felony murder, and the difference between them was "the special circumstance." What the prosecutor meant is unclear, but we see no prejudice. The trial court properly instructed the jury on the law of murder and the special circumstance allegation. There was thus no reasonable likelihood the jury construed or applied the oblique statement in an objectionable fashion. (*People v. Smithey, supra,* 20 Cal.4th at p. 960.)

Second, defendant challenges the prosecutor's statement that "[i]f you conclude that what Tony Mercurio said was accurate, that the defendant robbed Ron Gitmed and shot and killed him, the special circumstance is very straightforward." Defendant argues this statement was misleading because the evidence might have established that the robbery was only incidental to the murder, in which case the special circumstance would not apply. But the prosecutor was arguing *his* interpretation of the evidence, which was that the evidence showed either that defendant shot Gitmed during the commission of a robbery or, alternatively, that defendant was a major participant who aided and abetted the robbery with reckless indifference to human life. (See § 190.2, subds. (a)(17)(A), (d).) The prosecutor correctly explained that either theory of liability (direct perpetrator, or aider and abettor) allowed a true finding for the special circumstance allegation, but he described the former as "straightforward" and the latter as "trickier," meaning that aider and abettor liability involved a more complicated legal concept for the jury to grasp. We see nothing objectionable in the prosecutor's statement.

Third, defendant challenges the prosecutor's statement that, if the jury believed Mercurio was an accomplice, "[t]his is where felony murder comes back into play. Because if Tony Mercurio's an accomplice and he's just as

---

counsel's performance in failing to object fell below that expected of a reasonably diligent advocate. We reiterate, however, that a defendant cannot automatically transform a forfeited claim into a cognizable one merely by asserting ineffective assistance of counsel. (See *People v. Riel, supra,* 22 Cal.4th at pp. 1202–1203.)

involved as the defendant, under the felony-murder rule the defendant is still guilty of murder, if you find that the defendant aided and abetted in the commission of the robbery." Defendant claims this misstates aider and abettor liability for the robbery-murder special-circumstance allegation. But defendant's claim is inapposite because the prosecutor was explaining aider and abettor liability for felony murder, not for the special circumstance.

Fourth, defendant challenges the prosecutor's statement that "[n]o matter how you approach Tony Mercurio or how you approach the evidence, the only way that you can find that the defendant is not guilty of murder is that if you conclude that he had absolutely nothing to do with it and his name was picked out of the air by [the prosecution witnesses]." Defendant contends this comment, and other similar comments the prosecutor made, amounted to the argument that a robbery-murder special-circumstance allegation is a strict liability offense, that is, if a defendant is present when a robbery and killing happens, the special circumstance is true. But the prosecutor never argued that the jury should find the special circumstance allegation to be true simply because defendant was present at the scene of the robbery and murder. The prosecutor argued the evidence showed that defendant was not only present at the robbery and murder, but was, at least, an aider and abettor and, most likely, the actual shooter.

Finally, defendant repeats his contention regarding the murder conviction, discussed above, that the prosecutor misleadingly referred to Gitmed's car and duffel bag (both of which defendant apparently took after the robbery) as evidence establishing the predicate offense of robbery for felony murder. Defendant contends the prosecutor's comments were equally misleading for establishing the elements of the robbery-murder special-circumstance allegation. We reject his contention here for the same reason discussed above, namely, the prosecutor never argued the car and the bag were items taken during the robbery.

### 4. *Assertedly Erroneous Evidentiary Rulings*

Defendant contends his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution was violated because the trial court erred in (1) admitting the testimony of witnesses Danny Dalton and Barbara Triplett concerning defendant's statements about a person floating in the lake, and (2) denying trial counsel's motion to introduce, as impeachment evidence, a statement Dalton had made to a defense investigator that, if he were forced to testify at trial, he would pin the murder on Mercurio. We review a trial court's rulings on the admission and exclusion of evidence under the abuse of discretion standard. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113 [40 Cal.Rptr.3d 118, 129 P.3d 321].) As we discuss below, the trial court did not abuse its discretion.

### a. *Testimony about defendant's statements*

As recounted, Dalton ran the automobile "chop shop" at the compound. He testified that sometime during the week following the murder, while defendant was at the compound, he started to brag to Dalton about "leaving some dude floating." Dalton told defendant to shut up because he did not want to know anything about it. When Dalton learned defendant had told Dalton's sister Barbara Triplett and his niece Charlene about the floating man, Dalton became angry and wanted defendant to leave the compound. Asked by the prosecutor to explain what bad thing Dalton thought defendant was referring to, Dalton testified: "Sounds like he took somebody out and blew them away and left them floating in a lake, to tell you the truth. But that ain't what he told me. That's what I put together on my own. That's when I told him I didn't want to hear nothing and I didn't want him up at our house." Defense counsel did not object.

Barbara Triplett testified that around the same time defendant said something to her about a person floating in Canyon Lake who was not able to make decisions for himself. Defendant's statement made Barbara feel very uncomfortable and uneasy.

The day after Dalton's direct examination, and outside the jury's presence, defense counsel moved to strike, as inadmissible and objectionable speculation, Dalton's testimony as to what he had figured out about defendant's reference to the floating man. Counsel made no motion to strike Barbara Triplett's testimony. In the alternative, counsel agreed to the court's suggestion that the jury be admonished about lay opinion testimony. The trial court then instructed the jury: "I'm going to give you a cautionary instruction with respect to the opinions expressed by lay witnesses, and this is particularly, although it goes to all witnesses, particularly with respect to the direct testimony of Danny Dalton that you heard yesterday. [¶] You are to give no weight to the opinion of lay witnesses nor to draw inferences from the expressions of those opinions unless you find that the opinions are clearly based on facts to which the witness has testified."

Defendant contends the trial court erred in denying his motion to strike Dalton's testimony and that the court's admonition was inadequate and legally erroneous. Defendant also contends the trial court should have stricken Barbara Triplett's testimony, even though defense counsel did not object to it.

At the outset, defendant's claim as to Barbara Triplett's testimony is forfeited for want of a timely objection below. Defendant contends that, under *People v. Hill, supra,* 17 Cal.4th 800, he was excused from objecting to

Triplett's testimony because by the time she testified the court had denied defendant's motion to strike Dalton's similar testimony, thereby signaling it would also deny an objection to Triplett's testimony. *Hill* is inapplicable to the instant case. In *Hill*, we explained that a party may raise a claim on appeal despite the lack of an objection at trial where the circumstances show an objection would have been futile. (*Id.* at pp. 820–822.) No such futility is shown on the facts of this case. Defendant objected to Dalton's testimony and moved to strike it, but ultimately agreed instead to a cautionary instruction, which the court gave. Given these facts, defendant could not reasonably assume that, had he similarly objected to Triplett's testimony, the trial court would not offer some similar remedy. Accordingly, we cannot conclude an objection would have been futile, and if defendant had an objection to Triplett's testimony he was required to make it below. Because he did not, the claim is forfeited.

As to Dalton's testimony, we conclude the trial court did not abuse its discretion in denying the motion to strike. The trial court's admonishment to the jury (to which defense counsel agreed as an alternative) adequately addressed defendant's concerns about Dalton's speculative comments. Defendant contends the instruction was erroneous because it did not use the language of the Law Revision Commission's comment to Evidence Code section 800: "A witness who is not testifying as an expert may testify in the form of an opinion only if the opinion is based on his own perception." (Cal. Law Revision Com. com., reprinted at 29B pt. 3A West's Ann. Evid. Code (2009 ed.) foll. § 800, p. 3.) But the trial court's reference to "facts to which the witness has testified" expressed the same legal concept. In the context of Dalton's testimony, the "facts" about defendant's statements to which Dalton testified were the words Dalton had personally heard.

### b. *Exclusion of Dalton's statement about pinning the murder on Mercurio*

During Dalton's cross-examination by the defense, the prosecutor requested a recess when defense counsel began asking Dalton about a statement Dalton had made to defense investigator Thomas Crompton to the effect that Mercurio had admitted killing Gitmed. The prosecutor requested a foundational hearing outside the presence of the jury under Evidence Code section 402 to determine whether Dalton was going to admit or deny making that statement. At the Evidence Code section 402 hearing, defense counsel asked Dalton whether he had told Crompton that Mercurio committed the murder. Dalton denied saying it and explained, rather, that he had threatened to "pin it all on Tony [Mercurio] if he were forced to come testify." Dalton explained he did not want to come to court, then or now, and he was present only

because he had been subpoenaed. On cross-examination, Dalton specifically denied Mercurio had ever told him he was the one who committed the murder.

The prosecutor moved to exclude Dalton's statement to Crompton under Evidence Code section 352. After hearing argument from defense counsel that the statement should be admitted to show Dalton was willing to lie, the trial court granted the prosecutor's motion, holding the statement was "substantially more prejudicial than probative," and that Dalton "appear[ed] to be a reluctant witness making statements that he was going to pin this offense on somebody else without any foundation in fact for those assertions because he was angry about possibly having to come to court." Later, defense counsel asked the court to include Crompton's report in the record and asked for permission to call Crompton to testify about what defense counsel argued was Dalton's prior inconsistent statement contained in the report. The court read the report and ruled that Dalton's statement as reported was the same as his testimony about his statement to Crompton at the Evidence Code section 402 hearing; Dalton simply did not want to come to court, and he had no factual basis for pinning the crime on Mercurio. Consequently, the court denied defendant's motion to call Crompton or include his report in the record.

The trial court did not abuse its discretion under Evidence Code section 352 in excluding Dalton's remarks to Crompton. As the trial court ruled, Dalton's statements were the angry expressions of a reluctant witness who, to avoid being called to testify, threatened to falsely blame Mercurio for Gitmed's murder. It was within the trial court's discretion to find Dalton's statements more prejudicial than probative. Defendant contests the court's understanding of Dalton's remarks, arguing it makes no sense that Dalton would threaten to "pin it all" on Mercurio if Dalton was "mad" at Crompton, because Crompton was a defense investigator. Defendant argues that if Dalton wanted to be uncooperative with Crompton, he would have threatened to pin the murder on defendant, not Mercurio. Defendant therefore contends the trial court erred in denying the defense motion to introduce Crompton's report as a prior inconsistent statement.

We disagree for two reasons. First, the trial court's task was to determine the legal relevance of what Dalton had said; it was not required to find logical consistency in Dalton's angry threats. Second, Crompton's report indicates Dalton was angry at the possibility that the district attorney's office would subpoena him. Given that context, Dalton's anger and (false) threat make sense as being directed toward the district attorney. As respondent points out, whether Dalton understood that Crompton was a defense investigator is unclear. But even assuming Dalton understood Crompton worked for defendant, a reasonable reading of the report is that Dalton was angry at being

subpoenaed by the district attorney. Crompton was simply the bearer of bad news. The trial court therefore did not abuse its discretion in excluding Dalton's remarks as substantially more prejudicial than probative, and we need not address whether the report should have been admitted as a prior inconsistent statement.

### 5. *Cumulative Errors in the Guilt Phase*

Defendant contends the cumulative effect of the asserted guilt phase errors requires reversal of his conviction and death sentence even if none of the errors is prejudicial individually. We conclude that any errors or assumed errors were nonprejudicial, whether reviewed separately or cumulatively.

### II. BIFURCATED SPECIAL CIRCUMSTANCE TRIAL

#### A. *Discharge of Appointed Counsel and Defendant's Self-representation*

As recounted, at the guilt phase the jury found defendant guilty of first degree murder and found true the robbery-murder special-circumstance allegation, but found untrue the allegation he personally used a firearm in the commission of the murder. Defendant then orally moved under *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] and *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] to dismiss his appointed attorneys and to represent himself in the trial of the bifurcated prior-murder special circumstance and the penalty phase of trial. The court held a lengthy *Marsden/Faretta* hearing and subsequently stated on the record that defendant had clearly expressed his wishes to receive the death penalty, to call no witnesses, and to not confront or cross-examine any witnesses the prosecution called. The court granted defendant's request to represent himself, but placed his appointed attorneys on standby status. The case proceeded to a trial of the prior-murder special circumstance and then to the penalty phase. Defendant did not cross-examine prosecution witnesses or otherwise actively present a defense in the prior-murder special-circumstance trial or at the penalty phase, nor did he present any mitigating evidence or argument at the penalty phase.

#### B. *Trial on the Prior-murder Special Circumstance*

The prosecution presented the testimony of a former investigating detective with the El Paso County, Texas, sheriff's department to establish that, on March 11, 1977, defendant had pleaded guilty to, and was convicted of, the murder of Floyce Fox in El Paso County. A fingerprint expert testified that the

fingerprints from the Texas Department of Criminal Justice matched defendant's fingerprints taken while he was in custody in California. Based on this evidence, the jury found true the allegation that defendant had previously been convicted of murder.

### III. Penalty Phase

#### A. *Facts*

The prosecution presented as evidence in aggravation the factual circumstances of defendant's prior murder in Texas in 1976, defendant's 1987 conviction for being a felon in possession of a gun, and victim impact evidence.

Defendant, representing himself, presented no evidence or argument in mitigation.

##### 1. *Circumstances of the Texas Murder*

In September 1976, while hitchhiking, defendant was picked up by a man named Floyce Fox. Fox was driving a pickup truck and was in the process of moving from San Diego to Texas. Defendant and Fox drove through Arizona and New Mexico to El Paso, Texas. In El Paso, Fox was intoxicated, and defendant was driving the truck. Fox was arguing with defendant about his wallet being missing, and he told defendant to pull over on a gravel road. Defendant opened the passenger side door, and Fox got out, or fell out, on top of defendant. Fox threatened to kill defendant, and a fight ensued in which defendant fatally stabbed Fox with a knife defendant was carrying. Defendant went through Fox's pockets, found some money, and headed east in the truck, using Fox's credit cards along the way. Fox's body was found on September 22, 1976, lying by the roadside, with his right rear and left front pants pockets pulled inside out and the front pants pocket ripped. Defendant visited relatives in Texas, Missouri, and California, and then returned to Missouri, where he was arrested on October 12, 1976, and confessed.

##### 2. *Character of the Victim*

Gitmed's mother, Naomi Dekens, testified regarding the impact of her son's death. She described her son as childlike and loving, but also disruptive because of his anxiety disorder. He was diagnosed as emotionally retarded and was placed in a handicapped education program after repeating kindergarten twice. At age 12, he spent a year in the mental ward of the University of California, Irvine, hospital. At age 19, he finally earned his high school diploma, an achievement celebrated by his whole family. Dekens had always

hoped he could eventually overcome his emotional problems and grow into the man she knew he could be. He was unusually fearful of inanimate objects, but unusually trusting of people. He was very naive and gullible and subject to manipulation by people, such as his first and only girlfriend, who had taken financial advantage of him. Dekens often thought about the way her son had died and wished she could have protected him, particularly because during his life she had spent so much time trying to protect him.

Gitmed's younger brother, Bruce, who owned a produce business, testified that Gitmed sometimes worked at the business. Because of his disabilities, it was hard for Gitmed to find work, but Bruce testified his business had grown large enough that there would have been a place for him.

### 3. *Prior Felony Conviction*

The court took judicial notice of the court file containing documents that showed defendant was convicted on March 26, 1987, in Riverside County of being a felon in possession of a gun. (See § 12021.1.)

### B. *Issues*

### 1. *Miscellaneous Challenges to the Penalty Phase Statute*

Defendant raises various challenges to the constitutionality of the death penalty statute. We reaffirm the decisions that have rejected similar claims, and we decline to reconsider such authorities, as follows:

The penalty phase statute is not unconstitutional because it fails to establish or allocate the burden of proof for finding the existence of an aggravating factor, or because it does not require the jury to make additional written findings regarding the aggravating factors. (*People v. Geier* (2007) 41 Cal.4th 555, 618 [61 Cal.Rptr.3d 580, 161 P.3d 104]; *People v. Stitely* (2005) 35 Cal.4th 514, 573 [26 Cal.Rptr.3d 1, 108 P.3d 182].) The United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (*Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738]; *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]) have not altered our conclusions in this regard. (*People v. Salcido* (2008) 44 Cal.4th 93, 167 [79 Cal.Rptr.3d 54, 186 P.3d 437]; *People v. Hoyos, supra,* 41 Cal.4th at p. 926.)

The penalty phase instructions were not defective in failing to require juror unanimity on the aggravating factors. (*People v. Abilez, supra,* 41 Cal.4th at p. 533.)

The trial court is not constitutionally required to instruct the jury that certain sentencing factors are relevant only to mitigation. (*People v. Panah* (2005) 35 Cal.4th 395, 499–500 [25 Cal.Rptr.3d 672, 107 P.3d 790]; *People v. Kraft* (2000) 23 Cal.4th 978, 1078–1079 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

### 2. Discharge of a Juror at the Penalty Phase

During penalty phase deliberations, Juror L.R. asked to be excused from further service. The trial court ultimately granted her request on the ground that she was incapable of continuing to deliberate because of great mental distress. Defendant asserts the excusal of L.R. violated his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution because the trial court discharged her without cause, failed to adequately investigate misconduct by the other jurors, and failed to give adequate supplemental instructions to the jury before and after the discharge. We discern no error in the trial court's handling of this matter.

### a. Investigation and discharge

#### (1) Background

During penalty phase deliberations, the trial court received a note stating that Jurors L.R. and D.P. needed to speak with the court. The court permitted each juror to address the court individually, with only defendant and the attorneys present.[17] L.R. told the court the following: She had felt "pressured" at the end of the guilt phase and had gone along with a decision she "was not 100 percent sure of." The jury had agreed to go along with the "not true" finding on the personal gun use allegation because she refused to find it true. Now that she was deliberating the penalty, she was feeling "a lot of pressure." There was still a lot of doubt in her mind, which she tried pointing out to the other jurors. After questions by the trial court, L.R. stated she had a reasonable doubt about her verdict in the guilt phase and wished to retract it. The court had L.R. leave the room while it discussed with counsel how to proceed. The court determined that, under Evidence Code section 1150, the guilt verdict could not now be undone based on L.R.'s testimony about the jurors' mental processes, but it left open the possibility the defense could raise the issue in a motion for a new trial. The court had L.R. return and questioned her to determine whether she could continue as a juror in the penalty phase. She stated she could not.

The court then brought in and questioned Juror D.P. privately. D.P. stated that she had been "rushed" at the guilt phase. The stress of the current

---

[17] Having asserted his *Faretta* rights after the guilt phase verdict, defendant at this point was representing himself. (*Faretta v. California, supra,* 422 U.S. 806.) At his request, the trial court reappointed his trial counsel to assist him from this point onward.

deliberations in the penalty phase had made her sick the whole weekend, and she had migraines and was losing her hair. She could not make a decision in the penalty phase because she did not feel comfortable with what she had done in the guilt phase.

After Juror D.P. left, the court again asked the parties how to proceed. Defense counsel argued that L.R. and D.P. were expressing their lingering doubt about defendant's guilt, which, counsel contended, was an appropriate consideration in the penalty phase and should not be grounds for removal. Counsel requested that the court ask L.R. and D.P. whether the reason they felt they could not continue to deliberate was because the other jurors were telling them they should vote for the death penalty even though they had a lingering doubt about defendant's guilt. The trial court denied counsel's request to pursue this line of questioning, stating: "I'm treading a very thin line here, because I do not want to go behind the verdict into the mental processes by which that verdict was reached, or into the interaction between the different jurors, because that's impeaching the verdict improperly." The trial court said it would question the two jurors further solely on the issue of whether they were capable of continuing to deliberate.

The trial court brought L.R. back into court and asked her whether she felt "capable at this point in time of continuing to deliberate with [her] fellow jurors." She responded in the negative. Upon further questioning, she stated: "If I have to, I will get a doctor's excuse. I have not been able to sleep from the first time we were in the deliberating room. . . . And frankly, right now I'm ready to run out that door. I do not want to be here any longer. I don't want to talk to any other jurors." The trial court told her it would excuse her. After L.R. left, the trial court announced its factual findings, stating that L.R. "was clearly and obviously in very great distress. She could hardly maintain her seat. All she wanted to do was get out of here. . . . It would have been a cruel imposition to leave her in this situation on the jury. . . . [J]udged on her demeanor and her physical behavior in the courtroom, she was both physically and mentally incapable of continuing with deliberations as a trial juror, regardless of the reasons behind that."

The court then brought D.P. back into court and asked her whether she was capable of reaching a decision in the penalty phase as to the appropriate penalty. D.P. indicated she was not incapable of deliberating, but the decision she had reached was not that of the other jurors. The trial court advised D.P. it was perfectly acceptable for her to have formed conclusions and opinions, but it was also her duty to discuss them with the other jurors. After D.P. stated she was comfortable with that and comfortable with staying on the jury, the trial court returned her to the jury.

### (2) *Analysis*

██ "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged . . . ." (§ 1089.) Removal of a juror under section 1089 is committed to the discretion of the trial court, and we review such decisions by asking whether the grounds for such removal appear in the record as a demonstrable reality. (*People v. Wilson, supra,* 44 Cal.4th at p. 824.)

Defendant first contends the trial court abused its discretion because it did not adequately investigate misconduct by the other jurors before it discharged L.R. Defendant contends the trial court should have questioned the other jurors to determine whether they were causing the stress to L.R. and D.P. by impermissibly pressuring them to give up their lingering doubt about defendant's guilt. As we have cautioned, however, "a trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485 [106 Cal.Rptr.2d 313, 21 P.3d 1225].) Here, the source of the tension reported by L.R. and D.P. was the deliberations themselves, and the trial court therefore acted within its discretion in not examining the other jurors, because to do so would have threatened to intrude on the deliberation process. Defendant contends the other jurors may have been making insulting remarks in an effort to drive L.R. and D.P. off the jury or "were threatening them in some credible way." But that is speculation because the trial court's questioning of L.R. and D.P. revealed no suggestion of such actions by the other jurors. Because there was no indication of misconduct by the other jurors, the trial court acted within its discretion in limiting its inquiry to questioning L.R. and D.P., which, as detailed above, the court performed quite thoroughly.

Second, defendant contends the trial court dismissed L.R. without cause. He does not dispute the trial court's findings as to L.R.'s extremely agitated emotional state when she asked to be excused. Defendant's contention depends on his previous claim, rejected above, that the trial court did not adequately investigate whether the other jurors might have been pressuring L.R. to renounce her objections to imposing the death penalty. Defendant points to the rule promulgated in several lower federal cases that precludes the dismissal of a juror for being unwilling to deliberate whenever there is a reasonable possibility that the impetus for the dismissal stems from the juror's views on the merits of the case. (*People v. Cleveland, supra,* 25 Cal.4th

at pp. 483–484, citing *U.S. v. Symington* (9th Cir. 1999) 195 F.3d 1080, *U.S. v. Thomas* (2d Cir. 1997) 116 F.3d 606, and *U.S. v. Brown* (D.C. Cir. 1987) 262 U.S. App.D.C. 183 [823 F.2d 591].) As defendant acknowledges, however, we have expressly rejected this rule. (*Cleveland*, at pp. 483–484.) Furthermore, the issue posed in the instant case was not whether L.R. was *unwilling* to deliberate, but rather, based on her extremely distressed state, whether she was *unable* to deliberate. We have recognized that both trial-related and non-trial-related stress can provide good cause for discharging a juror. (See *People v. Collins* (1976) 17 Cal.3d 687, 690–691, 696 [131 Cal.Rptr. 782, 552 P.2d 742] [inability to cope with the experience of being a juror]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1099–1100 [31 Cal.Rptr.2d 321, 875 P.2d 36] [anxiety about new job].) We therefore conclude the trial court had good cause to dismiss L.R.

### b. *Supplemental Instructions*

After L.R. was excused, the trial court informed the remaining jurors that one person had been excused and admonished them not to speculate as to the reasons. The trial court instructed with CALJIC No. 17.51.1, which directs the jury to begin deliberations anew with regard to penalty with the newly appointed alternate juror. Defendant contends the trial court also should have given a lingering doubt instruction because it had learned (from the examination of Jurors L.R. and D.P.) that the legitimacy of lingering doubt was an issue in the deliberations. Furthermore, defendant contends a lingering doubt instruction was necessary because the dismissal of L.R. might have sent the message that a consideration of lingering doubt was illegitimate.

As defendant acknowledges, the trial court had no sua sponte duty to instruct on lingering doubt. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1252 [14 Cal.Rptr.2d 702, 842 P.2d 1].) Defendant's claim is forfeited because neither defendant (when he was representing himself at the penalty phase) nor his counsel (when they were reappointed) asked the trial court to instruct on lingering doubt. Furthermore, defendant merely speculates that, because of L.R.'s dismissal, the jury would have rejected any consideration of lingering doubt absent specific instruction by the court. We note the jury was instructed not to speculate about L.R.'s dismissal, and we presume a jury follows its instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 138–139 [2 Cal.Rptr.3d 186, 72 P.3d 1166]; *Francis v. Franklin* (1985) 471 U.S. 307, 324, fn. 9 [85 L.Ed.2d 344, 105 S.Ct. 1965].) Moreover, D.P., who had also expressed lingering doubt, was not excused, but was returned to the jury to deliberate. This circumstance militated against any inference that L.R. was dismissed for expressing lingering doubt. Finally, although the jury was not specifically instructed on lingering doubt, the concept of lingering doubt was sufficiently encompassed in section 190.3, factors (a) and (k), with which the

jury was instructed. (*People v. Hines* (1997) 15 Cal.4th 997, 1068 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

### 3. *Denial of Motion for a New Trial*

Defendant contends the trial court erred in denying his motion for a new trial based on juror misconduct and insufficient evidence, brought under section 1181 and the due process clauses of the state and federal Constitutions.[18] As we conclude below, the trial court did not abuse its discretion in denying this motion.

### a. *Background*

Defendant moved for a new trial based on juror misconduct in the form of failure to deliberate, harassment, and undue pressure on Jurors L.R. and D.P., and certain jurors' improper appeals to sympathy. In support, defendant submitted declarations from Jurors L.R. and D.P. Regarding the allegation of failure to deliberate, both L.R. and D.P. declared that several jurors, including the foreman, had determined defendant to be guilty before deliberations began and had refused to deliberate or consider the evidence. Based on L.R.'s declaration and the trial record, however, the trial court concluded that L.R. had persuaded the other jurors to review the evidence and to engage in the deliberative process, which continued for several days. The court found, furthermore, that the declarations' specific allegations belied the claim of failure to deliberate. L.R., for example, declared that she was constantly asked to justify her position by other jurors and was asked to view a photograph of the victim.

Regarding the allegations of harassment and undue pressure, L.R. declared that in response to her expression of doubt as to defendant's guilt, other jurors continually asked her: "How can you do this?" "How can you vote not guilty and still face the victim's mother in the courtroom?" "Knowing he's a killer, how can you vote not guilty and let him go free?" The foreman also shoved the victim's photograph in her face and asked: "What makes you think [the victim] is not dead?" L.R. also declared she was subject to personal attacks such as "How can you not see it?" and "How can you be so dumb?" D.P. declared the foreman stated: "His guilt is as plain as day." "We need to leave." "We're not going to keep coming back to go over the same things again."

---

[18] In this part, we discuss only defendant's juror misconduct claims. His sufficiency of the evidence claim was only touched upon at the new trial hearing and was actually argued and taken up in the hearing on the automatic application to modify the death verdict (§ 190.4, subd. (e)), which was held later in the same court session and is discussed in the next part.

The trial court found the statements L.R. reported, while possibly made in a heated or impolite fashion, were legitimate questions asked of a juror in "the hurly-burly of debate over the facts of the case that often happens in jury rooms," and that they were "statements inviting and asking [L.R.] to justify her position with facts drawn from the evidence." The court therefore found no misconduct. For the statements reported by D.P., the trial court similarly found they did not rise to the level of misconduct because they did not reflect what an average, reasonable juror would experience as undue pressure.

In support of his allegation of unlawful appeal to sympathy, defendant cited the question, asked of L.R. during guilt phase deliberations, how she could vote not guilty and still face the victim's mother in the courtroom. Although the trial court expressed some concern this question constituted a possible violation of the jury instruction not to consider sympathy, the court concluded it was essentially either an expression of frustration or an invitation to debate the facts of the case further in an attempt to persuade a dissenting juror. In that light, the trial court found the question was not misconduct.

Finally, defendant renewed his contention that the trial court had excused Juror L.R. without good cause. The trial court reiterated it had dismissed L.R. because she was unable to perform her functions as a juror and deliberate, even though her stress may have resulted from the comments or conduct of other jurors toward her during deliberations.

Having rejected defendant's juror misconduct claims, the trial court denied his motion for a new trial.

b. *Analysis*

"We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard." (*People v. Navarette* (2003) 30 Cal.4th 458, 526 [133 Cal.Rptr.2d 89, 66 P.3d 1182]; see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 128 [17 Cal.Rptr.3d 710, 96 P.3d 30].) " 'A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.' " (*People v. Lewis* (2001) 26 Cal.4th 334, 364 [110 Cal.Rptr.2d 272, 28 P.3d 34]; see *People v. Hayes* (1999) 21 Cal.4th 1211, 1260–1261 [91 Cal.Rptr.2d 211, 989 P.2d 645].)

No abuse of discretion occurred in this case. As recounted above, the trial court found that the declarations of L.R. and D.P. themselves refuted the claim that the other jurors had failed to deliberate; instead, the alleged harassing comments of the other jurors constituted evidence they did in fact

engage in deliberation. Defendant contends this finding was an abuse of discretion because "the only reasonable reading" of the two declarations is that two separate and nonoverlapping sets of misbehaving jurors existed, those who did not deliberate and those who harassed, and that the harassing jurors' statements cannot be used to refute the claim that some other jurors did not deliberate. We reject defendant's strained reading of the declarations. Both L.R.'s and D.P.'s declarations speak of the jurors' refusal "to engage in any *meaningful* discussion or deliberation." (Italics added.) Both declarations go on to detail the behavior that L.R. and D.P. believe indicated a lack of meaningful discussion or deliberation, which included the various comments the trial court found to be, in fact, evidence of deliberation. The declarations do not present examples of objective failure to deliberate, such as jurors who turned their backs or otherwise objectively segregated themselves from the deliberations. We therefore conclude the trial court's reading of the declarations was reasonable and that it did not abuse its discretion in finding no failure to deliberate.

 Nor did the trial court abuse its discretion in finding no harassment or undue pressure on L.R. and D.P. Although some of the comments reported in the declarations were heated, nothing in them rises to the level of misconduct. As we have observed, "jurors can be expected to disagree, even vehemently, and to attempt to persuade disagreeing fellow jurors by strenuous and sometimes heated means." (*People v. Johnson, supra,* 3 Cal.4th at p. 1255.)

### 4. *Denial of Automatic Application to Modify the Sentence*

Defendant contends the trial court erred in denying his automatic application to modify the death verdict under section 190.4 and that the error violated his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution. In ruling on the motion, "the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." (§ 190.4, subd. (e).) The judge must state on the record the reason for his or her findings. (*Ibid.*) "On appeal, we independently review the trial court's ruling after reviewing the record, but we do not determine the penalty de novo." (*People v. Steele* (2002) 27 Cal.4th 1230, 1267 [120 Cal.Rptr.2d 432, 47 P.3d 225].)

The trial court satisfied these statutory requirements. It reviewed, on the record and in detail, the aggravating and mitigating factors listed in section 190.3 and stated its independent judgment that the weight of the evidence

supported the jury's verdict of death. Although defendant, acting as his own attorney during the penalty phase, presented no mitigating evidence, the court considered in mitigation that he had behaved in an exemplary fashion throughout the trial and that he may have taken methamphetamine on the night of the crime, although there was no evidence this impaired his judgment in any way.

In contending the trial court's findings were not supported by substantial evidence, defendant repeats his arguments, discussed and rejected above, that insufficient evidence in the record supported his guilt either as the shooter or as an aider and abettor. In addition to reiterating these contentions, defendant contests the following inferences and findings by the trial court, all of which we uphold as supported by substantial evidence:

The trial court described defendant as a "major beneficiary" of the murder because he acquired the victim's car and some of his property. Defendant disputes he could be described as a major beneficiary because, he argues, he ended up burning the car, and Mercurio and his girlfriend ended up with most of the furniture from Gitmed's storage locker. But neither the fact defendant eventually burned the car in order to conceal the crime nor that he decided to give Mercurio some of the property he took from the storage locker reduces his status as a major beneficiary to the crime.

Defendant disputes the trial court's finding that the police found many of Gitmed's belongings in the possession of defendant's relatives. As discussed above, however, police found Gitmed's jacket and duffel bag in the trunk of defendant's mother's car.

Defendant challenges the trial court's finding he showed no remorse. The court based its finding on defendant's burning the car to conceal the crime and his comments about the man floating in Canyon Lake. The trial court's comments about lack of remorse, furthermore, were permissible as indicating the absence of evidence of the mitigating factor of remorse, which, as defendant acknowledges, is a proper consideration in reweighing the balance of aggravating and mitigating factors. (*People v. Crittenden* (1994) 9 Cal.4th 83, 149–151 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Defendant's boasting to Danny Dalton about leaving someone floating in the lake certainly supports the trial court's finding that defendant lacked remorse.

Finally, defendant challenges the trial court's comments about his murder of Floyce Fox as an aggravating factor of past criminal activity. The trial court noted similarities between the murders of Fox and Gitmed. The trial court stated defendant killed Fox, an inebriated man in a remote area, for the purposes of acquiring his worldly possessions and his vehicle. Defendant

contends there was no evidence for the conclusion that theft was a motive for Fox's murder. But, as previously detailed, evidence supports the inference that theft was a motive: Fox's body was found with his pockets turned inside out and, after the murder, defendant drove off with Fox's car and used his credit cards.

### 5. Death Sentence Grossly Disproportionate to Defendant's Individual Culpability

Defendant contends the imposition of the death penalty on him, given the circumstances of this case, is grossly disproportionate to his individual culpability and violates the Eighth Amendment to the United States Constitution. In addressing this contention, which is essentially a request for intracase proportionality review, we examine the circumstances of the offense and the personal characteristics of the defendant, including prior criminality. (See *People v. Steele, supra,* 27 Cal.4th at pp. 1268–1269.)

As to the circumstances of the offense, we have previously rejected defendant's claims that the split verdict means the jury found he was not the shooter and that insufficient evidence supports his conviction as an aider and abettor. As discussed, the evidence supports the conclusion that defendant, even if not the shooter, was a major participant in the crime. He intentionally maneuvered Gitmed, a particularly vulnerable individual, to an isolated spot for the purpose of robbing and killing him, which was effectuated by defendant acting alone or together with Mercurio. As to defendant's personal characteristics, he had committed a previous murder in Texas. A prior murder is among the most compelling of aggravating circumstances. (*People v. Steele, supra,* 27 Cal.4th at p. 1269.) We therefore conclude defendant's death sentence is disproportionate neither to his offense nor his personal culpability.

### 6. Miscellaneous Challenges to the Death Penalty

Defendant raises various challenges to California's death penalty law. We affirm the decisions that have rejected similar claims and decline to reconsider such authorities as follows:

The jury need not make written findings disclosing the reasons for its penalty determination. (*People v. Young, supra,* 34 Cal.4th at p. 1233; *People v. Prieto* (2003) 30 Cal.4th 226, 276 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

The absence of intercase proportionality review does not violate the Eighth and Fourteenth Amendments to the United States Constitution. (*People v. Cook* (2007) 40 Cal.4th 1334, 1368 [58 Cal.Rptr.3d 340, 157 P.3d 950];

*People v. Moon* (2005) 37 Cal.4th 1, 48 [32 Cal.Rptr.3d 894, 117 P.3d 591]; see also *Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871] [intercase proportionality review is not required by the federal Constitution].)

The use of certain adjectives such as "extreme" and "substantial" in the list of mitigating factors in section 190.3 does not render the statute unconstitutional. (*People v. Prieto, supra,* 30 Cal.4th at p. 276.)

Capital punishment per se does not violate the Eighth Amendment's proscription against cruel and unusual punishment. (*People v. Hoyos, supra,* 41 Cal.4th at p. 927.)

## IV. DISPOSITION

The guilt and penalty judgments are affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.